**TECHWORLD DEVELOPMENT CORP., et al., Plaintiffs,**

**v.**

**D.C. PRESERVATION LEAGUE, et al., Defendants.**

**D.C. PRESERVATION LEAGUE, et al., Plaintiffs,**

**v.**

**INTERNATIONAL DEVELOPERS, INC., et al., Defendants.**

**UNITED STATES of America, Plaintiff,**

**v.**

**TECHWORLD HOTEL ASSOCIATES, et al., Defendants.**

**Civ. A. Nos. 86–0252, 86–0266 and 86–0837.**

United States District Court, District of Columbia.

Aug. 5, 1986.

Maureen E. Mahoney, Eric A. Stern, Latham, Watkins & Hills, Washington, D.C., for D.C. Preservation League and Committee of 100 on the Federal City.

William G. Thomas, Roy Niedermayer, Nancy E. Lasater, Thomas & Fiske, Washington, D.C., for Techworld.

John H. Suda, James R. Murphy, Robert J. Harlan, Jr., Office of Corp. Counsel, Washington, D.C., for District of Columbia.

James T. Draude, Lynn Johnson, F. Henry Habicht, III, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for Federal defendants.

MEMORANDUM

BRYANT, Senior District Judge.

## BACKGROUND

The present action arises from the attempt of a group of real estate developers, including International Developers, Inc., Techworld Realty, Inc., Techworld Development Corp., and FF Realty Corp., to create Techworld. Techworld is a proposed International Trade Center for high technology and information industries, in downtown Washington. It will include 700,000 square feet of showrooms, a conference center with 150,000 square feet of meeting space, a 800 room convention hotel, 70,000 square feet of retail, restaurant and public service facilities, underground loading facilities, and a garage for 2,000 cars.

The project will be located on two city blocks on the south side of Mt. Vernon Square, between Seventh and Ninth Streets and K and I Streets, Northwest Washington. The portion of Eighth Street running through the middle of the project will be converted to a pedestrian plaza with shops and restaurants. Approximately 75 feet above this plaza a five-story bridge will connect the top five stories of the main structures on either side of Eighth Street, unifying the entire project into one large building. The entire building is planned to rise to a height of 130 feet.

In order to realize their conception of integrating Eighth Street into Techworld, the developers sought to have it closed by the city of Washington, and to have title to the street transferred to them. Title to Eighth Street was vested in the United States government. The Street and Alley Closing Procedures Act of 1982 (the " '82 Act"), D.C.Code § 7–421, et seq. (1985 Supp.), provides a mechanism whereby the D.C. City Council may be petitioned to pass legislation closing streets in the city and transferring title. Pursuant to the '82 Act, the developers filed an application with the Surveyor of the District of Columbia to close Eighth Street between I and K Streets, and an alley on the Techworld site. The Surveyor solicited comments from a

broad spectrum of city agencies, including the Fire and Police Departments, the Department of Environmental Services, the Office of Planning, and the Department of Housing and Community Development. Each of these groups reviewed the proposal and, recommended the Council grant the application. The National Capital Planning Commission, a federal agency, also approved the street closing. The Historic Preservation Review Board opposed.

These agencies made several suggestions as to limitations and conditions which should be placed on the developers, to insure the street closing would be advantageous to the city. Apparently in response to some of the concerns raised, the City Council imposed five covenants to run with Eighth Street, as a condition to the closing. The Council demanded an easement for emergency vehicles, a 45,000 square feet easement for pedestrian circulation, and another easement to preserve the view between along Eighth Street and the Carnegie Library at Mt. Vernon Square to the north and the Museum of American Arts/National Portrait Gallery to the south. The Council also required the developers to commit themselves to the basic components of the project they had presented, and to install a sprinkler system. At the request of the Council, the developers worked out the language for these covenants together with the D.C. Office of Planning.

In April 1984, Mayor Barry forwarded the application to the City Council. The Council's Committee on public works held hearings on the application, at which many interested groups expressed their opinions. Included were neighborhood groups from nearby Chinatown, the D.C. Chamber of Commerce, and the University of the District of Columbia. The Deputy Mayor for Economic Development, representing the Mayor's Office, enthusiastically supported the project, writing that:

> We are very exited about this major investment and exciting project in the downtown area. The short and long term benefits of this mixed-use development, the diverse activities and proposed target tenant population make it even more exciting and attractive. This project will enable the District to diversify its economic base and achieve a goal that underlies all of our economic development plans.... I strongly hope this development project and its many beneficial contributions will be able to proceed promptly.

Moore Committee Report, Techworld Group Exhibit 8, at 7.

The Committee found that the project will have a "positive fiscal impact" on the District. It will provide 330 full time jobs during construction, and over 1,300 jobs after completion. (The developers anticipate 6,800 full time jobs will be generated by 1989). Sixty-six percent of these jobs will go to District residents. The Committee also anticipated $22,000,000 in tax revenue for the District during construction, and over $15,000,000 annually thereafter.

In its final report, dated September 26, 1984, the Committee reported favorably on the proposed legislation, and recommended Eighth Street be closed.

In November 1984, the Council voted unanimously to close the street and transfer title to the developers. It passed two acts, the Eighth Street Closing Acts, effecting the closing and transfer. Transfer of title was conditioned upon the developers executing and recording the five covenants previously agreed to. The developers executed and recorded them with the D.C. Recorder of Deeds on November 16. The Mayor signed the Acts on November 29. As required by the District of Columbia Self-Government and Governmental Reorganization Act, D.C.Code § 1-211 et seq., the Eighth Street Closing Acts were forwarded to both houses of Congress for a mandatory 30-day review period. Congress did not exercise its right to veto the legislation, and at the end of the 30 days, the Acts became law.

Throughout these lengthy proceedings leading up to the Eighth Street closing, the developers expressed their intention to apply to the Zoning Commission as a Planned

Unit Development ("P.U.D."). P.U.D. approval allows a structure to exceed or otherwise vary from the regulatory limits established in zoning regulations. The developers specifically sought Zoning Commission authorization to exceed the regulatory density limits, and to obtain a waiver of the set-back requirement fronting on Mt. Vernon Square.

Beginning November 1984, the Commission held extensive hearings on the P.U.D. application. The Commission granted the application, but in its June 21 order, it established 37 conditions regarding Techworld's use, height, design, employment of minorities, and construction. The Commission required that one-third of Techworld be used as a trade center perpetually, and imposed strict ratios of showroom, display and office floor areas which the developers must employ.

This last condition was especially onerous to the developers, as it interferred with efforts to obtain financing. They therefore withdrew their P.U.D. application, determining to proceed with Techworld under the mandated regulatory zoning limitations, including the proscribed density and set-back limitations. The design the developers intend to proceed with, however, does not differ significantly from the design approved by the Zoning Commission.

The D.C. Preservation League and the Committee of 100 on the Federal City, are organizations concerned with protection of landmarks and the historic character of the District. They are also dogged opponents of Techworld. They testified in opposition at the hearings on the Eighth Street Closing Acts, and at the Zoning Commission hearings. On October 1985, they wrote to the regional Director of the Department of the Interior's National Capital Region, arguing that the Eighth Street Closing Acts were an unlawful appropriation of United States property. The preservationists demanded in their letter that the Department immediately move to reclaim the street, and they threatened a mandamus action if the Department refused. The preservationists also persistently threatened the de-velopers and D.C. Government officials with a lawsuit to halt Techworld's development.

These threats came to fruition on January 28, 1986, when the preservationists filed suit for declaratory and injunctive relief against the developers, several D.C. Government officials, and the National Capital Planning Commission. They also sued the Department of the Interior for mandamus relief, as they promised in their October letter. The same day the preservationists filed their complaint, the developers filed an action seeking a declaration as to the legality of the project, in order to remove the cloud of legal uncertainty which had arisen. These two actions were consolidated on February 5.

On March 28, apparently in response to the preservationists mandamus action, the Department of the Interior filed an action to quiet title to Eighth Street. The preservationists thereafter consented to having the mandamus claim dismissed. The federal government action was consolidated with the other two. On March 29, 1986, the Lawyers Title Insurance Co., which has insured the developers' good title to Eighth Street, intervened into the consolidated actions. Finally, the court has received three amicus briefs all in favor of the Techworld project.

All parties have filed motions to dismiss or for summary judgment. The preservationists and the federal government have contrived several arguments to demonstrate how either the developers or the District of Columbia government have violated the law in the course of developing Techworld. Several arguments challenge the City Council's authority to pass the Eighth Street Closing Acts. The government argues that the City Council's closing the street violated a provision of the Home Rule Act. The preservationists argue that the Council's action was unconstitutional. The preservationists also argue that the developers' decision to withdraw their P.U.D. application violated an implied covenant imposed by the Eighth Street Closing Acts. The preservationists also claim the

procedures leading up to the passage of the Acts were deficient for failure to follow the requirements of the National Historic Preservation Act.

Besides these claims concerning the closing of Eighth Street, the federal government argues that the proposed 130 feet height of Techworld violates the Height of Buildings Act. And the preservationists argue that all permits issued by the Mayor in connection with Techworld must conform to the procedures of a local District of Columbia historic preservation law.

We address each of these arguments in turn, and, for the reasons stated below, grant summary judgment for each one in favor of the developers and the District of Columbia.

THE HOME RULE ACT

■ The District of Columbia Self-Government and Governmental Reorganization Act, D.C.Code §§ 1–211 et seq., commonly known as the Home Rule Act, creates the D.C. local government and vests it with authority to pass legislation. The federal government argues that the Eighth Street Closing Acts are invalid extensions of the Council's authority under the Home Rule Act. The government specifically refers to this provision:

The Council shall have no authority to ... [e]nact any act, or enact any act to amend or repeal any act of Congress which concerns the functions or property of the United States....

Section 1–233(a)(3). Because title to Eighth Street was vested in the United States, the government argues the Eighth Street Closing Acts are acts concerning United States property within the meaning of the Home Rule Act's prohibition and, therefore, are void.

The government's argument only is plausible if one considers the above-quoted language in total isolation, and casts a blind eye to more than 50 years of congressional delegation of street closing authority to local D.C. government. This history, considered together with the treatment Congress has continued to give street closings performed by the Council under the Home Rule Act, exposes the glaring superficiality of the government's argument. Congress never intended the Home Rule Act to circumscribe the street closing authority D.C. governments have so long enjoyed.

The Constitution grants Congress plenary authority over the District of Columbia. Art. I, § 8, cl. 17. The Supreme Court recognized early on that Congress would need to establish a municipal governing body, to be responsible for matters which are characteristicly local in nature.

> They [original proprietors] must also have contemplated that a municipal corporation must soon be created to manage the concerns, and police, and public interests of the city; and that such a corporation would and ought to possess the ordinary powers for municipal purposes which are usually confined to such corporate bodies. Among these are certainly the authority to widen or alter streets, and to merge and in many instances to dispose of public property, or vary its appropriation.

*Van Ness v. City of Washington*, 29 U.S. (4 Pet.) 232, 281, 7 L.Ed. 842 (1830).

Authority over the streets of the city is a paradigmatic municipal function; the sort of function one should expect a municipality to have. As the Supreme Court stated over 100 years ago:

> ... the care and superintendence of streets, alleys, and highways, the regulation of grades, and the opening and closing of old streets, are peculiarly municipal duties. No other power can so wisely and judiciously control this subject as the authority of the immediate locality where the work is to be done.... [T]he general judgment of the country has always accepted the municipal organization as the one subject to the least objection for the execution of this duty. *In inquiring, therefore, where the power was vested in a particular case, we should expect to find that it was given to the municipality.*

*Barnes v. District of Columbia*, 91 U.S. (1 Otto) 540, 547, 23 L.Ed. 440 (1875) (empha-

sis added). It is unsurprising, then, that Congress also viewed the power to close and dispose of streets in the District of Columbia as a municipal power, and that it chose to delegate that municipal power to the municipal government it had created. Congress performed this delegation by passing the Street Readjustment Act of 1932, D.C.Code § 7.401 et seq. ('32 Act).

Prior to 1932, each street closing required the Commissioners of the District to obtain an individual piece of legislation from Congress. That the local District government did not have the authority to close its own streets without congressional consent was deemed "manifestly inappropriate," by the National Capital Park and Planning Commission, which encouraged Congress to pass the '32 Act. S.Rep. No. 688, 72d Cong., 1st Sess. 3 (1932). Congress agreed that the D.C. government should have the power to close D.C. streets, because that is a characteristic municipal power enjoyed by other city governments:

> The object of this bill is to give the District Commissioners the same power and authority that the city councils already have in various cities of the country.

75 Cong.Rec. 287 (1932) (Remarks of Cong. Patmar).

But Congress passed the '32 Act and empowered the D.C. government to close streets not out of some altruistic desire to vest the city government with more prestige; rather Congress wished to spare itself the chore of having to take up such banal, parochial matters as whether to close some street in the District. The congressional deliberations leading up to the passage of the '32 Act reveal Congress was of one mind: the Act was needed to rectify the ridiculous fact that the national legislative body for the entire United States had to stop all its business and consider a request by a city commissioner to close a street.

Representative of such sentiments are the remarks of Congressman Underhill:

> It is ridiculous to take the time of Congress with such things, when we have so little time to consider matters of great importance. Each time the necessities of the District require that an alley be closed or a street opened or some little minor matter of detail attended to in the conduct of the affairs of the District, which should be taken care of not by the Commissioners, but by some superintendent of streets or some head of a department, it is ridiculous to have to bring such things before the Congress and have it act upon them. I hope this bill will pass and, in consequence, that Congress will be relieved of these minor details, which have no place in this body.

75 Cong.Rec. 287 (1932).

In the same vein, Congressman Black stated:

> It is highly absurd that the Congress of the United States, carrying on its shoulders the weighty problems of the country, should have to pass separate acts every time the District Commissioners require a blind alley to be closed in Washington, or some side street that does not mean anything.

*Id.*

The Act was passed over no significant objection. It gave the local D.C. government the authority to close streets in its discretion, and to transfer title to those streets. Significantly, it provided that when title to the street in question is vested in the United States, the local government still may close it and still may transfer or dispose of that title, "to the best advantage of the locality and the properties therein and thereby affected...." D.C. Code § 7–401. Congress believed the street closing was no less local, and no more worthy of congressional attention, because title to the street is vested in the United States.

This street closing power was exercised by the city government at least ten times from 1932 to 1967. *See* Appendix to Memorandum of Intervenors Lawyers Title Insurance Corporation ("Intervenors' appendix"). In 1967, the form of local govern-

ment was changed, but the street closing authority was expressly passed on to the new government, which continued to exercise it at least five times until 1973. *See* Reorganization Plan No. 3 of 1967, 81 Stat. 948, § 402 (168) (1967); Intervenors' appendix.

In 1973 Congress again restructured the District government, by passing the Home Rule Act. The Home Rule Act delegates to the present District government all powers which had been granted the previous government. D.C.Code § 1–227(a). At the time this Act was passed, the street closing authority had been in place for many years, and had frequently been exercised. That authority, then, continues to be enjoyed by the present government, unless, in passing the Home Rule Act, Congress specifically intended to revoke it.

It is highly unlikely that Congress intended to revoke a municipal authority like street-closing in the context of a law intended to relieve Congress of its municipal responsibilities over the District. As the Home Rule Act states, its purpose is to:

relieve Congress of the burden of legislating upon essentially local District matters.

D.C.Code § 1–201(a). The Home Rule Act is designed to accomplish in a broader way the same thing the '32 Street-Reorganization Act was designed to accomplish: to spare Congress the chore of considering municipal matters. As Senator Eagleton stated:

I believe it is not in the interest of this body, nor is it in the interest of the citizens of the United States we are elected to represent, or even of the citizens of the District of Columbia, that the time of the United States Senate be spent preparing, holding hearings, considering and debating matters that are purely local in nature. Rather, as your committee proposes in this bill, Congress should delegate the making of these local regulations to a body elected by the citizens of the District of Columbia....

Home Rule for the District of Columbia, 1973–1974, Background and Legislative

History of H.R. 9056, H.R. 9682, and Related Bills Culminating in the District of Columbia Self-Government and Governmental Reorganization Act, Pub.L. 93–198, 93d Cong., 2d Sess. at 2755 ("History"). Congress expressed no regret at imposing its municipal authority on the local District government:

Happily, [Congress] will not be concerned with sanitation commissions, and with closing alleys and determining whether or not one can fly kites. It will be concerned only with those broader aspects of oversight of the District of Columbia Government. That is what the Congress of the United States is for, not to be a city council, so long as the Federal interest is protected, and I submit it aptly is.

History at 2177–78.

In 1932, Congress granted the local D.C. government authority to close streets and transfer title because it believed such closings are local matters, undeserving of congressional attention. In 1973 Congress passed the Home Rule Act to relieve Congress of the burden of legislating on local matters. It would be bizarre to read the Home Rule Act as reclaiming for Congress the burden of deliberating on local street closings. If Congress intended to repossess this one local function, in the course of passing a law divesting itself of local responsibilities, one would expect to find some reference in the legislative history to this exceptional effect, or some concern that street closing authority is one local responsibility Congress should reclaim. There is no such reference.

The history up to the passage of the Home Rule Act concerning street closing authority in the District definitively demonstrates Congress' desire that the local government effect street closings and transfers of title. The subsequent history of street closings effected since the passage of the Act conclusively demonstrates Congress' ongoing satisfaction with the local government's exercise of that authority.

Under the Home Rule Act, each act passed by the City Council must be forwarded to both houses of Congress for review. The legislation does not become effective for 30 days, during which time, Congress may veto it. D.C.Code 1–233(c)(1). (The Council also may pass emergency legislation which has provisional effect for 90 days, still subject to congressional review and veto. *Id.*) Between the effective date of the Home Rule Act and 1982, several street closings were performed by the City Council. *See* Intervenor's Appendix. Each closing was forwarded to Congress for review. None was ever objected to or vetoed.

In 1982, the City Council passed the Street and Alley Closing Procedures Act of 1982, D.C.Code § 7–421 et seq. (1985 Supp.). This law altered the procedures by which the Council may close streets. This law, too, was sent to both houses of Congress, which thereby were confronted directly with a law reaffirming the City Council's street closing authority. Congress showed no objection and allowed that legislation to become law.

Since the passage of the Closing Procedures Act, several more streets have been closed under the new procedures, including Eighth Street, at issue here. *See* Intervenor's Appendix. Each of these closings also was forwarded to Congress, which had the opportunity to review, object to, and veto each closing individually. In every case Congress allowed the street closing to take effect, and expressed its tacit approval. *See Alaska Airlines v. Donovan,* 766 F.2d 1550, 1556 (D.C.Cir.1985).

Over 50 years ago Congress determined it had no desire to consider street closings in the District of Columbia, and it authorized the local government to close streets and transfer title. Over 50 years of practice have reaffirmed that commitment. The Federal government in this case cannot point to one expression of congressional desire to repossess that authority. Congressional satisfaction with the present scheme has never been clearer than since the passage of the Home Rule Act, under

which Congress has individually reviewed each street closing. The delegation of street closing authority has become so accepted over time, that even federal agencies seeking to close a street for their own purposes have petitioned the City Council for a street closing act. *See* Memorandum of the District of Columbia, exhibits 1, 2 and 3. In the face of all this, how the Federal government can maintain that in passing the Home Rule Act, Congress intended to revoke street closing authority, is nearly beyond comprehension.

In support of its argument, the government only can point repeatedly to the language in the Home Rule Act which prohibits the City Council from passing any acts concerning the "functions or property of the United States." D.C.Code § 1–233. The District of Columbia Court of Appeals considered that language in another case, and arrived at an interpretation of it which is persuasive, consistent with the tenor of the Home Rule Act, and sensible in the context of street closings.

In *District of Columbia v. Greater Washington Central Labor Council, AFL–CIO,* 442 A.2d 110 (D.C.1982), a union challenged the City Council's passage of a workman's compensation act for the District. As the old workman's compensation law had been passed by Congress, was administered by the Secretary of Labor, and was adjudicated in federal courts, the union argued workman's compensation in the District was a federal matter, and that the new law affected a "function of the United States," and was invalid. The court rejected this argument, finding that the language of the Home Rule Act, § 1–233, was included to "safeguard the operations of the federal government on the national level." *Id.* at 116. The court quoted the following language from the legislative history:

> The functions reserved to the federal level would be those related to federal operations in the District, and to property held and used by the federal government for conduct of its administrative, judicial, and legislative operations; and for the

monuments pertaining to the nation's past.

*Id.*

This court agrees that the limitation of § 1–233 is included to ensure that the local government does not encroach on matters of national concern. It withholds authority over property used by the United States in connection with federal governmental functions, and over property of national significance. The Council may not concern itself with the Lincoln Memorial, or the White House, or with the United States Courthouse. The closing of a small street in Northwest Washington, however, is precisely the sort of local matter Congress wishes the D.C. Council to manage.

Congress did not intend, by the language of § 1–233, to revoke the District government's traditional authority to close streets and transfer title to streets in the District, even where title is vested in the United States. The Eighth Street Closing Acts, which were individually reviewed by Congress and which Congress allowed to become law, are valid exercises of Council authority under the Home Rule Act.

THE APPOINTMENTS CLAUSE

■ The preservationists argue that the Eighth Street Closing Acts run afoul of the Appointments Clause of the United States Constitution, art. II, § 2, cl. 2. The Appointments Clause provides that "Officers of the United States" must be nominated by the President, and that the more important presidential nominees must also be confirmed by the Senate. (Inferior officers need not be confirmed.) They rely entirely on one line in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), which states that,

> ... any appointee exercising significant authority pursuant to the laws of the United States is "an Officer of the United States," and must, therefore, be appointed in the manner proscribed by [the Appointments Clause].

*Id.* 424 U.S. at 126, 96 S.Ct. at 685. The preservationists argue that when the District of Columbia Council closed Eighth Street, it exercised significant federal au-

thority, which under *Buckley* only may be exercised by one appointed pursuant to the Appointments Clause. Because the City Council is elected, not appointed, the Eighth Street closing must be declared invalid.

The preservationists' argument is based on one line cavalierly plucked out of an extraordinarily lengthy and complex case. Even a brief investigation of *Buckley* reveals it addressed facts and significant federal concerns completely absent from the present case. The holding and reasoning of *Buckley* simply have little or nothing to do with the City Council closing a one block section of Eighth Street.

*Buckley* involved a challenge to a Federal law establishing rules governing national elections and establishing a commission to monitor and administer those rules on an ongoing basis. Congress reserved for itself the right to appoint some members of the commission. This arrangement was challenged on the basis that Congress was encroaching on the sphere of the executive branch of government by appointing Federal officials with "wide-ranging rulemaking and enforcement powers with respect to the substantive provisions of the Act." *Buckley*, 424 U.S. at 118, 96 S.Ct. at 682. The appellants argued that presidential appointment, "is the exclusive method by which those charged with executing the laws of the United States may be chosen." *Id.*

This proposition was accepted by the Court. The Court discussed the importance of the Appointments Clause to maintaining the separation of powers, and the concern of the framers that the legislative branch not "aggrandize itself" at the expense of the other branches. *Id.* 424 U.S. at 129, 96 S.Ct. at 687. Congressional appointment of the Federal Election Commission was invalid because the commissioners exercised executive authority, specifically, "enforcement power, exemplified by ... discretionary power to seek judicial relief." *Id.* 424 U.S. at 138, 96 S.Ct. at 691. This duty to enforce the laws through legal

action is one especially entrusted to the President. *Id.*

The Court remained clear, however, that not all congressional appointments violate the Appointments Clause.

Insofar as the powers confided in the Commission are essentially of an informative nature, falling in the same general category as the powers which Congress might delegate to one of its own committees, there can be no question that the Commission as presently constituted may exercise them.

*Id.* The Court concluded that Congress may make appointments

... in aid of the functions that Congress may carry out by itself, or in an area sufficiently removed from the administration and enforcement of the public law as to permit their being performed by persons not "Officers of the United States."

*Id.* 424 U.S. at 139, 96 S.Ct. at 691.

The present case, concerning the closing of Eighth Street by the City Council, presents no separation of powers problems. Congress has plenary authority over the District of Columbia. U.S. Const., art. I, § 8, cl. 17, and it is indisputable that Congress could, if it chose, pass an act closing Eighth Street. Finding its responsibility over municipal matters onerous, however, Congress delegated the authority to close streets to the local government. Each such action must, under the Home Rule Act, be individually reviewed and allowed to pass by Congress. This merely amounts to a delegation of authority to the Council to initiate legislation, which always must be reviewed by Congress. The Council "operates merely in aid of Congressional authority to legislate." *Id.* 424 U.S. at 141, 96 S.Ct. at 692. The Appointments Clause does not prohibit Congress from delegation of legislative authority, so long as Congress does not attempt to extend its power beyond its legislative domain. As Congress can pass the Eighth Street Closing Acts itself; the Appointments Clause does not forbid it from allowing the City Council to pass it, subject to congressional review.

*See Washington v. Confederated Bands and Tribes of the Yakima Indian Nation,* 439 U.S. 463, 501, 99 S.Ct. 740, 761, 58 L.Ed.2d 740 (1979); *United States v. Sharpnack,* 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958).

Furthermore, the authority conferred on the City Council is not federal authority which must be performed by "Officers of the United States." Congress has a unique "dual authority" over the District of Columbia: it may legislate as the Federal legislative body, as it does for the 50 states, or it may legislate as the state legislative body. *Keller v. Potomac Electric Co.,* 261 U.S. 428, 443, 43 S.Ct. 445, 448, 67 L.Ed. 731 (1922).

Not only may statutes of Congress of otherwise nationwide application be applied to the District of Columbia, but Congress may exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes.... [T]he power of Congress under Clause 17 permits it to legislate for the District in a manner with respect to subjects that would exceed its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it under Article I, § 8.

*Palmore v. United States,* 411 U.S. 389, 397–98, 93 S.Ct. 1670, 1676, 36 L.Ed.2d 342 (1972). *See also District of Columbia v. Thompson Co.,* 346 U.S. 100, 109, 73 S.Ct. 1007, 1012, 97 L.Ed. 1480 (1952).

The power Congress has given the local government over streets in the District falls within this second, unique power of Congress to legislate over the District as a state legislature. As discussed in the previous section, Congress plainly believed in passing the 1932 streets closing legislation that its authority over the city streets—including those with United States title—was a purely municipal authority. And the Home Rule Act also is legislation conferring ordinary municipal powers on the municipal government, not federal power.

When the City Council acts to close a city street it is not exercising any significant federal authority, pursuant to any law of national application. Rather, it acts as a municipality, pursuant to a congressional law unique to the District of Columbia. By authorizing the City Council to close city streets, Congress does not make the councilmen "Officers of the United States." None of the concerns of *Buckley v. Valeo* are implicated. The Appointments Clause is aimed at federal appointments of common national significance. It is inapplicable to this case.

## THE ZONING PROCEEDING

■ Throughout the proceedings leading up to the passage of the Eighth Street Closing Acts, the developers represented that they intended to build Techworld as a Planned Unit Development ("P.U.D."). This meant they would seek Zoning Commission approval, rather than proceeding under the normal "matter-of-right" regulations, which require no approval. The developers did undergo the Zoning Commission proceedings at considerable expense, but when the Zoning Commission restrictions were imposed, the developers found them prohibitively burdensome. They thereafter withdrew their P.U.D. application, and elected to proceed as a matter-of-right.

The preservationists argue that because the developers stated to the City Council that they would proceed as a P.U.D., that the court should find the Council transferred title to Eighth Street with an implied covenant that development must proceed as a P.U.D. This court should also find that by proceeding as a matter-of-right, the developers have violated that implied covenant, and that it should be enforced as a condition of the developers continuing further.

Neither the Eighth Street Closing Acts nor the 1982 Closing Procedures Act mention anything about zoning requirements on their face. The preservationists concede this, but argue this court should find that the Council intended this implied covenant when it passed the Eighth Street Closing Acts.

The preservationists must find this argument an uncomfortable one to make. A nonlawyer might think that if the Council and the Mayor did intend an implied covenant which was not honored, that they would be the ones complaining. But they are satisfied. The Council and the Mayor are before this court arguing there is no such covenant. Their presence here was necessitated by the lawsuit brought against them by the preservationists, who seem determined to prove to the Council and the Mayor that they did intend a covenant, whether they think so or not.

Present statements by the Council and the Mayor of their intent in passing the Closing Acts are not dispositive of legislative intent. Common sense dictates, however, that this court note that the Council and the Mayor, two years after the passage of the Closing Acts, believe the Acts were satisfactorily complied with, and that they request the court to so find.

The weakness of the preservationists' posture reflects the weakness of their substantive position. Five explicit covenants were imposed on the developers by the Council as conditions for closing Eighth Street. These covenants concern access for emergency vehicles, pedestrian circulation, fire safety, and preservation of the view between the Carnegie Library, to the north of Eighth Street, and the National Portrait Gallery to the south. The covenants were duly filed by the developers with the D.C. Recorder of Deeds. As the Council imposed five express covenants, it is highly unlikely they intended a sixth which they forgot to include. The doctrine of *expressio unius est exclusio alterius* suggests that if the Council intended a sixth covenant, they would have expressed it with the other five. *See National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974).

This is especially true because the five covenants which were imposed were re-

sponsive to concerns raised before the Council by the many groups testifying before it. One suggestion made by opponents of Techworld was that the Council not close Eighth Street until after the Zoning Commission acted on the P.U.D. *See* Moore Committee Report, Techworld exhibit 8, at 4. Further, the City Office of Planning originally recommended that the closing be contingent upon P.U.D. approval. *Id.* at 6. Thus the very covenant the preservationists now argue was implied, was placed squarely before the City Council at the time it imposed the five express covenants. Its failure to include a sixth enacting these suggestions must be deemed a deliberate rejection of the idea. *Cf. National Railroad Passenger Corp.,* 414 U.S. at 458, 94 S.Ct. at 693.

The full weakness of the preservationists' argument, however, becomes clearer with an understanding of the regulatory zoning scheme in the District of Columbia. Title 11 of the D.C. Regulations provides for various, specific limitations on development in differently zoned areas in the city. If a developer remains within these limitations, he may proceed as a matter-of-right; that is, without Zoning Commission proceedings. The Zoning Commission proceeding is employed if a developer wishes to exceed the matter-of-right limitations. As the preservationists state in their papers, "the P.U.D. regulatory process requires Zoning Commission approval, whereas matter-of-right development does not." Preservationists Reply Memorandum at 10.

Under this system, the choice whether to proceed as a P.U.D. or as a matter-of-right is the developers'. The Director of the D.C. Office of Planning testified to this before the Council:

> You can't force someone to go forward with a PUD or a matter of right development.... In other words, you have a piece of property. I can't force you to come down to the Zoning Commission and do anything. It's only if you want to get certain things done.

May 22, 1984 hearing before City Council, Preservationists exhibit 36, at 9. The cove-

nant the preservationists argue was intended would create a radical exception to this regulatory scheme. It would mean the Council took away the developers' choice, and committed the developers to go through the Zoning Commission, even if they intend to proceed within the normal regulatory limitations. It is unclear what such a proceeding would even consist of, as the purpose of P.U.D. applications is to obtain authorization to vary matter-of-right limitations.

If the Council intended to impose such a unique burden on the Techworld developers, one which carves out a peculiar exception to the regulatory scheme, one would expect to find some clear evidence of this intent. Indeed, as the Council was made aware of the strictly voluntary nature of P.U.D. proceedings, if they wished to make them mandatory for Techworld, they would have discussed and acted upon this in some concrete way. There is no evidence that the Council intended such exceptional treatment for Techworld. Rather, the evidence shows that the Council was apprised that Zoning Commission proceedings are voluntary, and took no steps to change that.

The Techworld developers originally sought P.U.D. approval to achieve greater density than the zoning regulations allow, and to obtain a waiver of the set-back requirement fronting on Mt. Vernon Square. By withdrawing their P.U.D. application, the developers have given up their intention to exceed the regulatory limitations and have submitted themselves to them. Absent some clear indication that the Council specifically forbade such an otherwise permissible course of action, this court declines the preservationists' invitation to fashion an exception to the zoning regulations.

### THE NATIONAL HISTORIC PRESERVATION ACT

█ The preservationists level one final argument against the procedural validity of the Eighth Street closing, based on the National Historic Preservation Act of 1966, 16 U.S.C. § 470 et seq. ("NHPA"). The NHPA provides that federal agencies re-

sponsible for a federal "undertaking" involving certain historic areas, must allow the Advisory Council on Historic Preservation a "reasonable opportunity" to make a nonbinding comment. The only federal agency involved with the Eighth Street closing is the National Capital Planning Commission ("NCPC") which, pursuant to the '82 Closing Procedures Act, made a nonbinding recommendation to the City Council during the Council's deliberations. In practical terms, the preservationists argue that before the NCPC made its nonbinding recommendation to the City Council, it should have given the Advisory Council a reasonable opportunity to provide a nonbinding recommendation to it. The NCPC's failure to do so invalidates the entire Eighth Street closing.

In legal terms, whether the Eighth Street closing triggers the NHPA depends on whether the NCPC participation transformed this purely local proceeding into a federal "undertaking", within the meaning of the statute. Section 470f of the Act provides:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470v of this title a reasonable opportunity to comment with regard to such undertaking.

A federal undertaking is where a federal agency has direct or indirect jurisdiction over a project involving the expenditure of federal funds, or the issuance of a federal license. The only role the NCPC had in this case was to make a nonbinding recommendation to the Mayor. *See* D.C.Code § 7–422. The Mayor is free to follow or ignore the recommendation as he sees fit. The NCPC neither approves the expenditure of federal funds, nor issues any federal license in connection with the street closing. On its face, section 470f plainly is inapplicable to the NCPC in the context of the Eighth Street closing.

In its papers, the preservationists concede that the "limited" language of section 470 does not support their argument. *See* Preservationists Reply Memorandum at 21. They rely instead on the purportedly broader definition of undertaking in the regulations, 36 C.F.R. § 800.2(c). In 1980, when Congress passed amendments to the NHPA, a House Committee referred to the regulatory definition as "acceptable." *See* H.Rep. No. 1457, 97th Cong., 2d Sess. 45 (1980), U.S.Code Cong. & Admin.News 1980, p. 6378. The preservationists contend that Congress thereby endorsed a broader application of the NHPA than it originally intended.

This proposition—that a remark by a House Committee constitutes formal congressional adoption of a new statutory definition—is dubious under any circumstances. But in the present case it is utterly preposterous. In 1980 the entire Congress amended the NHPA to include an explicit, statutory definition of undertaking. This definition states that, " 'undertaking' means any action as described in section 470f of this title." Section 470w(7). Rather than adopt any new definition of undertaking, Congress explicitly reaffirmed the original language of section 470f. The language of that section—which the preservationists acknowledge does not support the argument—is dispositive.

Furthermore, the regulatory definition of undertaking only corroborates the conclusion that the Eighth Street closing is no federal undertaking. The language of § 800.2(i) clearly requires a level of federal involvement in local projects far deeper than the NCPC's modest role in the Eighth Street closing. A local project only be-

comes a federal undertaking when a federal agency lends its "... approval, sanction, assistance, or support...." *Id.* Examples of such federal involvement include projects directly undertaken by the agency, projects supported by federal loans or contracts, projects licensed by the agency, or projects proposed by the federal agency for congressional funding or authorization. *Id.* The regulation requires the federal agency be substantially involved in the local project, either with its initiation, its funding, or its authorization, before a local project is transformed into a federal undertaking.

Again, the NCPC's only role in a street closing in the District of Columbia is to provide the Mayor with a nonbinding recommendation. This minimal participation is insufficient to trigger the NHPA. The NCPC is correct in its own assessment, which it provided the Justice Department in a litigation report:

> ... when the NCPC has a purely advisory role, as it does with review of street and alley closings, it does not consider the act an "undertaking" requiring compliance with section 106 of the NHPA.

NCPC Litigation Report, Techworld exhibit 17, at 4.

## THE HEIGHT OF BUILDINGS ACT

The developers intend to build Techworld to a height of 130 feet. The height of buildings in the District of Columbia is regulated by the relevant provision of the Height of Buildings Act of 1910, ("HBA"), which provides:

> (a) No building shall be erected, altered, or raised in the District of Columbia in any manner so as to exceed in height above the sidewalk the width of the street, avenue, or highway in its front, increased by 20 feet; but where a building or proposed building confronts a public space or reservation formed at the intersection of 2 or more streets, avenues, or highways, the course of which is not interrupted by said public space or reservation, the limit of height of the building shall be determined from the width of the widest street, avenue or highway.

D.C.Code § 5–405. The federal government and the preservationists argue that the HBA limits the maximum height of Techworld to 110 feet. The developers, the government, and the preservationists all seek a declaration as to the maximum permissible height of Techworld.

█ Two preliminary concerns must be addressed before proceeding to the merits. First, the Corporation Counsel argues for the District government that this issue is not yet ripe for resolution because the local authorities have not yet issued a construction permit allowing Techworld to rise to any specific height. But this case is ripe because the developers have made plain their intention of building Techworld to 130 feet, most recently in the complaint in this action. The federal government and the preservationists have made equally plain their position that such a height is unlawful. All parties request a determination, and "there is a substantial controversy, between parties of adverse legal interests, of sufficient immediacy and reality." *Lake Carriers' Association v. MacMullan,* 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed. 257 (1972), quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

Second, the developers argue the enforcement provision of the D.C.Code § 5–408 gives the D.C. Corporation Counsel exclusive authority to bring suit to enforce the HBA, and that therefore neither the preservationists nor the federal government have a right of action.

█ The developers are correct that there is no general private right of action for the HBA, and therefore the preservationists' claim must be dismissed. But the federal government stands on a different footing. It owns Mt. Vernon Square, adjoining the Techworld site. The statute indirectly authorizes a neighboring property owner, such as the government, to bring an action to enforce the HBA. *See* D.C. Code §§ 5–426, 5–418(a). Furthermore, the federal government has the general right

to initiate suits to protect the interests and property of the United States. *United States v. Jacinto Tin Co.*, 125 U.S. 273, 279, 8 S.Ct. 850, 853, 31 L.Ed. 747 (1888). In this case, the government's property interest in Mt. Vernon Square provides a basis for it to bring an HBA claim.

■ Even though the government may bring an action in this case, Congress explicitly entrusted the Corporation Counsel with primary responsibility for enforcing the HBA. In addition, the Corporation Counsel is the chief legal advisor for the District, with authority to enforce the D.C. Code. *See* D.C.Code § 1–361. Therefore, opinions rendered by the Corporation Counsel concerning the application of the HBA are entitled to substantial deference, and should only be overturned by this court if they are plainly unreasonable or contrary to legislative intent. *Chevron, U.S.A. v. National Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1983); *Williams v. Washington Metropolitan Transit Company*, 472 F.2d 1258, 1264 (D.C.Cir.1972).

The Corporation Counsel has issued two opinion letters in which it states the HBA permits Techworld to be 130 feet high. It also argues the same position before the court in this case. It presents two distinct justifications for its opinion. Because the government has failed to show how either of these justifications is unreasonable or contrary to the legislative intent, this court upholds the Corporation Counsel's determination.

### (a) *The General Rule*

The general rule of the HBA is that a building may be built to a height equal to the width of the street on which it fronts plus 20 feet. In applying the HBA, the Corporation Counsel may request a determination of the width of a fronting street, from the Surveyor of the District of Columbia. To determine this width, the Surveyor either checks the recorded width, or if no width has previously been recorded, he makes an official determination by referring to the King Plats of the City. *See*

Deposition of D.C. Surveyor Ralph B. Sheaffer, U.S. exhibit 10, at 12–13. The King Plats are the definitive First Survey of the District of Columbia, prepared by Nicholas King in 1803. *Id.* at 14. King, a contemporary of L'Enfant, was the first surveyor of the District. *Id.*

When a fronting street forms part of a public traffic circle, square, or other public space, the Surveyor determines its width by measuring full across the entire public space depicted on the plat. *Id.* at 35–36; Opinion Letter of Deputy Corporation Counsel, Oct. 1984, U.S. exhibit 3, at 2. He has on several occasions deemed the official width of such streets to be not less than 110 feet, even where the width of the street considered without the public space is less. The Corporation Counsel has employed such determinations on several occasions in approving building heights. *See id.* at 2–3.

The Farragut Building on Farragut Square is 130 feet high, and the new Army-Navy Club will be 130 feet high, even though the actual widths of the streets they front on are less than 110 feet. The Prudential Building on McPherson Square will reach a height of 130 feet, even though it fronts on a street less than 110 feet wide. In all these cases, the Surveyor determined the widths of the fronting streets to be not less than 110 feet, because of their locations on public spaces, and the Corporation Counsel has relied on these determinations in applying the HBA. *See id.;* Sheaffer deposition exhibits B, C, and D.

The Corporation Counsel applied this consistent administrative practice to Techworld. Techworld fronts on the south side of Mt. Vernon Square, a public space. Accordingly, the Corporation Counsel opined that K Street fronting the Techworld site is not less than 110 feet wide, a determination consistent with the depiction of the Square on the King Plat. The maximum allowable height of Techworld is 110 feet plus 20 feet, or 130 feet. '84 Opinion Letter at 2–4.

That this interpretation reflects a consistent, demonstrable administrative prac-

tice, further adds to the weight of the Corporation Counsel's opinion. *See Udall v. Tallman,* 380 U.S. 1, 17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964). The pernicious result of undoing this longstanding practice would be to expose at least three other buildings in downtown Washington to HBA claims.

The government argues the Corporation Counsel's '84 opinion should be discounted because it apparently was drafted by a law firm retained by the Techworld developers. This argument has no bearing on the opinion's authoritative status. Once the Corporation Counsel signed and issued the '84 opinion, it became the official position of the city, just as if this court signed a proposed order submitted by the government, that order drafted by the government would become the official order of the court.

More to the point, the government also argues the Corporation Counsel's opinion is unreasonable because of its reliance on the King Plats. The Plats were drafted before the existence of "public reservations," which are areas appropriated by the Federal government. Many public spaces depicted on the King Plats are now public reservations, including Mt. Vernon Square. Because the Plats do not reflect the public reservations, they cannot be used to determine street widths of public spaces.

A public reservation, however, is only a jurisdictional concept. As the D.C. Surveyor stated:

> U.S. reservations are merely numbers for inventory purposes, so the Park Service can identify and make reference to a piece of ground that it has jurisdiction over.

Sheaffer deposition at 15. The existence of federal jurisdiction over an area depicted on a plat does not disturb the accuracy of the dimensions on the plat. The existence of public reservations make no difference to the Surveyor's determinations of the distances and proportions reflected on the plat.

The King Plats remain the definitive survey of the District of Columbia. The Surveyor is fully justified in using them to determine street widths. Furthermore, the Corporation Counsel need not go out with a yardstick and measure the width of the street himself. He is fully justified in relying on the determination of the expert surveyor of the District. The Corporation Counsel's opinion regarding the application of the HBA to Techworld is consistent and reasonable, and this court has no reason to disturb it.

(b) *The Public Reservation Exception*

In the '84 and '85 opinion letters, the Corporation Counsel provided another justification for its determination that Techworld may rise to 130 feet. The HBA provides an exception to the general rule, which provides that when a building fronts on a public space or reservation,

> Formed at the intersection of two or more streets, avenues or highways, the course of which is not interrupted by said public space or reservation, the limit of height of the building shall be determined from the width of the widest street, avenue, or highway.

D.C.Code § 5–405. In the opinion of the Corporation Counsel, Techworld satisfies this exception, because it fronts on Mt. Vernon Square, a public reservation formed by the convergence of several streets.

Specifically, the Corporation Counsel found that the course of K Street is uninterrupted. This is because K Street enters the Square on one side, travels without a break around the Square, and emerges from the opposite side. *See* '84 Opinion Letter at 2. Also, the "course" of K Street is its direction or compass heading. K Street enters and exits Mt. Vernon Square on the same heading; it shows no displacement of its axis, and so its course is uninterrupted. *See* '85 Opinion Letter at 2; *Black's Law Dictionary,* 424 (Rev. 4th ed., 1969).

This analysis of the course of K Street is consistent with that of the D.C. Surveyor. He testified that the course of K Street, as

well as the courses of Massachusetts Avenue and New York Avenue, are uninterrupted, because there is no break in their alignment going into and coming out of the Square. *See* Sheaffer deposition at 29–30.

K Street converges with Seventh and Ninth Streets, which also are uninterrupted. Therefore, the Corporation Counsel believes Mt. Vernon Square is a public reservation, formed by the intersection of two or more streets, the courses of which are not interrupted by the Square. The Corporation Counsel used the public reservations exception to calculate the maximum permissible height of Techworld. The width of K Street at its widest point entering the Square allows a height of 130 feet. *See* '85 Opinion Letter at 2–3.

The government disagrees with this analysis, and argues that the course of K Street is interrupted by Mt. Vernon Square, because traffic on K Street must skirt around the Square in order to pass it. That is, because K Street bends around Mt. Vernon Square, the government argues its course is interrupted, and that the public reservations exception does not apply.

Once again, the government misconceives this court's role in reviewing the Corporation Counsel's opinion. *See Chevron, U.S.A.,* 467 U.S. at 845, 104 S.Ct. at 2783. That opinion will only be overturned if the government demonstrates it is plainly unreasonable or contrary to legislative intent. Instead of such argument, the government merely offers an alternative interpretation of the HBA. This court finds the Corporation Counsel's interpretation reasonable, and consistent with the language of the HBA. There is no basis on which to overturn it.

## THE HISTORIC LANDMARK AND HISTORIC DISTRICT PROTECTION ACT

■ In their final claim, the preservationists argue that Techworld is subject to the District of Columbia Historic Landmark and Historic District Protection Act, D.C. Code § 5–1001 et seq. ("HLHDPA"). The HLHDPA provides, *inter alia,* that prior to issuing permits to alter the exterior of a historic landmark, the Mayor must refer the permit application to the Historic Preservation Review Board for its comments. Section 5–1005(b). In their complaint, the preservationists argued the Mayor's issuance of an excavation permit without first seeking the Board's comments was a violation of the HLHDPA. In their papers, however, they admit an excavation cannot alter a vista, which is the purported landmark, and they restrain themselves to arguing that the Mayor must refer all *future* construction permits to the Board for their nonbinding recommendation.

The HLHDPA applies to historic landmarks which it defines as sites listed in the D.C. Inventory of Historic Sites. Section 5–1002(6). That inventory lists hundreds of entries, one of which is the "Eighth Street Vista from Mt. Vernon Square to National Archives." *See* Inventory, Techworld exhibit 15. Because of this listing, the preservationists argue that the HLHDPA applies to Techworld, which lies on Eighth Street south of Mt. Vernon Square.

The listing upon which the preservationists rely, however, contains an inscrutable inaccuracy. "Vista" means view. *See Webster's New International Dictionary* 2851 (2d ed. 1945). There simply is no view down Eighth Street, from Mt. Vernon Square to the National Archives, as the Inventory describes. The National Portrait Gallery is on Eighth Street between these two sites, and it completely obscures the view. One cannot possibly see the Archives from Mt. Vernon Square, nor can one see the Square from the Archives—the Portrait Gallery is in the way. The Inventory, therefore, describes a view that does not exist. It is impossible to know what is meant by the listing.

The preservationists argue there is such a thing as an "interrupted vista," and that the Inventory describes an interrupted vista running from Mt. Vernon Square, *through* the Portrait Gallery, and on to the Archives. The evidence in the record, however, is sorely deficient in demonstrating such an oxymoronic concept. The preservationists point to a report by the Historic

Preservation Review Board, which discusses the arrangement of the buildings along Eighth Street but which does not discuss the concept of an interrupted vista. Preservationists exhibit 10, at 2–3. They also refer to a hopelessly muddled passage by an expert witness who testified before the D.C. Zoning Commission; a passage which explains nothing at all. Preservationists exhibit 21.

The preservationists also argue that because the Eighth Street vista was included in the Inventory by a panel of experts, they must have known what they meant. But this begs the question: by describing something which does not exist, the court cannot know what they meant. It is also true that the Eighth Street vista listing was merely one of hundreds, and the fact that it is so inscrutable suggests the compilers of the Inventory were not always able to exercise a constant degree of care.

Because the description in the Inventory of the Eighth Street vista is so flawed that it is impossible to know what is described, the HLHDPA does not apply to Techworld.