732 F.2d 1375
 14 Envtl. L. Rep. 20,608
 George STORY, Story Farms, Inc., a Corp.; Hunter Rafferty;
W.C. Bryant; Bryant Farms, Inc., a Corp.; Glen E. Ault,
Jr.; Wendell Choate; Choate Farms, Inc., a Corp.; Lloyd
Hall; Jim Bogle; Mount Level Farms, Inc., a Corp.;
Consolidated Drainage District No. 1 of Mississippi County,
Missouri and Levee District No. 3 of Mississippi County,
Missouri, Appellees,
v.
John O. MARSH, Jr., Secretary of The Army; General Joseph
K. Bratton, Chief of Engineers Corps of Engineers, U.S.
Army; General William E. Read, Division Engineer, Lower
Mississippi Valley Division, Corps of Engineers, U.S. Army
and President, Mississippi River Commission and Colonel John
F. Hatch, Jr., District Engineer, Memphis District, Corps of
Engineers, U.S. Army, Village of East Cape Girardeau, et
al., Amici Curiae (for appellants).
UNITED STATES of America, Appellant,
v.
11.9 ACRES OF LAND, MORE OR LESS, SITUATE IN MISSISSIPPI
COUNTY, STATE OF MISSOURI, and James H. Amberg, et
al., (Tract No. 5E), Appellees,
UNITED STATES of America,
v.
62.0 ACRES OF LAND, MORE OR LESS, SITUATE IN MISSISSIPPI
COUNTY, STATE OF MISSOURI, and St. John Levee and Drainage
District of New Madrid and Mississippi Counties, Missouri,
et al., and Unknown Owners, (Tract No. 2E-2), Appellees,
UNITED STATES of America, Appellant,
v.
62.0 ACRES OF LAND, MORE OR LESS, SITUATE IN MISSISSIPPI
COUNTY, STATE OF MISSOURI, and St. John Levee and Drainage
District of New Madrid and Mississippi Counties, Missouri,
et al., and Unknown Owners, (Tracts No. 3E and 10E), Appellees.
UNITED STATES of America, Appellant,
v.
1426.5 ACRES OF LAND, MORE OR LESS, SITUATE IN MISSISSIPPI
AND NEW MADRID COUNTIES, State of Missouri, and Levee
District No. 3 of Mississippi County, Missouri, et al.,
(Tracts Nos. 1E-1 and 1E-2), Appellees.
UNITED STATES of America, Appellant,
v.
1426.5 ACRES OF LAND, MORE OR LESS, SITUATE IN MISSISSIPPI
AND NEW MADRID COUNTIES, State of Missouri, and
Levee District No. 3 of Mississippi
County, Missouri, et al.
(Tract No. 2E-1), Appellees.
 Nos. 83-1643, 83-1644.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 30, 1983.
Decided April 13, 1984.
 
 F. Henry Habicht, II, Acting Asst. Atty. Gen., Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., Thomas E. Dittmeier, U.S. Atty., St. Louis, Mo., Edwin B. Brzezinski, Asst. U.S. Atty., St. Louis, Mo., Philip M. Zeidner, Rebecca Donnellan, Jacques B. Gelin, Nancy B. Firestone, Attys., Dept. of Justice, Washington, D.C., for appellant; Martin Cohen, U.S. Army Corps of Engineers, Washington, D.C., Bruce Anderson, U.S. Army Corps of Engineers, Memphis, Tenn., Lucille Latta, U.S. Army Corps of Engineers, Vicksburg, Miss., of counsel.
 James W. Herron, Richard A. Wunderlich, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., amicus curiae.
 Stephen E. Strom, Finch, Bradshaw, Strom & Steele, Cape Girardeau, Mo., for appellee Levee Dist. No. 3 of Mississippi County, Missouri.
 James E. Reeves, Ward & Reeves, Caruthersville, Mo., for the above named appellees except appellee Levee District No. 3 of Mississippi County, Missouri.
 Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and McMILLIAN, Circuit Judge.
 HENLEY, Senior Circuit Judge.
 
 
 1
 The United States and the Secretary of the Army, et al., appeal from an order of the district court, 574 F.Supp. 505, permanently enjoining the Secretary of the Army and his subordinates in the United States Army Corps of Engineers from artificially crevassing the frontline levee of the Birds Point--New Madrid Floodway (hereinafter "the Floodway") during high flood stages on the Mississippi River. The government also appeals from the orders of the district court denying the United States possession of certain lands described in declarations of taking filed in five condemnation cases; those lands are located in the Floodway.Background
 
 
 2
 The Floodway is a component of the Mississippi River and Tributaries Project, located on the west bank of the Mississippi River in Mississippi and New Madrid Counties, Missouri, just below the confluence of the Ohio and Mississippi Rivers. It was established under authority of the Flood Control Act of May 15, 1928, 45 Stat. 534. The Floodway is approximately 33 miles long and 10 miles wide and contains an estimated 130,000 acres of alluvial valley land, 330 residences and 1,300 people. The Floodway is enclosed by frontline and setback levees except for a 1,500 foot gap at the lower end which serves as a drainage outlet and allows flood backwaters to enter. The frontline levee, which forms the eastern boundary of the Floodway, consists of three parts: the upper fuse plug section (11 miles long); the lower fuse plug section (5 miles long); and the section between the two fuse plugs. The setback levee forms the western boundary of the Floodway, and is 36 miles long; it begins at its junction with the frontline levee at Birds Point directly across the Mississippi River from Cairo, Illinois, and ends near the mouth of the St. John's Bayou at New Madrid on the Mississippi River.
 
 
 3
 As originally developed, the front line levee was constructed to protect the Floodway until the river reached the 55 foot stage on the Cairo gauge, at which time the flood water would naturally overtop the front line levee. Congress authorized modification of the Floodway in the Flood Control Act of 1965. P.L. 89-298, 79 Stat. 1073. Pursuant to this Act, the Corps of Engineers in 1966 modified its plan for operation of the Floodway; the plan called for raising the upper and lower fuse plugs to 60.5 feet, raising the frontline levee to 62.5 feet and raising the setback levee to 65.5 feet. The plan also called for operation of the Floodway by artificial crevassing by means of explosives of only the upper fuse plug section of the frontline levee when river stages were at or above 58 feet on the Cairo gauge with a prediction that stages would exceed 60 feet. The plan envisioned that natural crevassing might occur in the lower fuse plug section in the event of a flood of that magnitude.
 
 
 4
 After approval of the 1966 plan, the levee system's construction was significantly improved and the frontline levee was raised and strengthened. The government also obtained modified flowage easements over a portion of the Floodway to permit the expected artificial crevassing and the resultant inundation in the event of a major flood. However, the Corps became increasingly concerned that the 1966 plan might require excessively high quantities of explosives and might not constitute the most effective or safest method of operating the Floodway. Its concern was based upon additional information on actual river conditions gained as a result of the 1963, 1975 and 1979 floods, and recalculations reflecting the changes in the levee system and the river. The Corps' analysis also indicated that natural crevassing might not occur, because the levees had been strengthened by widening and raising. It concluded that, given the critical nature of the outflow crevasses, artificial means, including use of explosives, might be necessary. The Corps conducted further tests and concluded that it was possible to operate the Floodway more safely and effectively by means of four artificial crevasses in the frontline levee: two artificial inflow crevasses in the upper fuse plug and two artificial outflow crevasses, one in the lower fuse plug and one in the frontline levee opposite Hickman, Kentucky. The Corps, in 1983, adopted a modified plan calling for the artificial crevassing of both the upper and lower fuse plugs, and the middle section of the frontline levee.
 
 
 5
 In order to ensure access to the frontline levee, the United States filed complaints in condemnation and declarations of taking to acquire the interests necessary to enter and artificially crevasse the frontline levee.[1] Shortly after the declarations of taking were filed, several parties, including individuals residing in the Floodway, filed a separate action to enjoin the government from artificially crevassing the frontline levee. They also sought a declaratory judgment that the government, in developing its plan to artificially crevasse the frontline levee in times of severe flooding, had violated the National Environment Policy Act (NEPA), the Clean Water Act, and the fifth amendment.
 
 
 6
 After a hearing, the district court concluded that (1) the Flood Control Act of 1965 does not provide congressional approval of the 1983 plan to artificially crevasse the frontline levee; (2) even if the 1965 Act authorizes the plan, the government failed to secure the necessary easements required by the Act; (3) no substantial evidence suggests that artificially crevassing the frontline levee is necessary to operate the Floodway successfully; and (4) the government violated NEPA by failing to prepare an Environmental Impact Statement (EIS). Accordingly, the district court entered a permanent injunction preventing the government from implementing the 1983 plan to artificially crevasse the frontline levee in four places.
 
 
 7
 With regard to the condemnation cases, the district court determined (1) the estimated just compensation deposited in the condemnation cases was arbitrary and capricious, (2) the government's claim that it will restore the levees after severe flooding is an attempt to deny plaintiffs their right to just compensation, and (3) in the event this court decided that the government was entitled to proceed with operation of the Floodway, as a condition of obtaining possession the government must deposit as estimated compensation for Levee District No. 3 the sum of $6.4 million and for the St. John's Levee and Drainage District the sum of $4 million.
 
 Injunction Action
 Scope of Review
 
 8
 The government contends that the decision of the Corps of Engineers to artificially crevasse both the upper and lower fuse plug sections and the frontline levee is an action "committed to agency discretion by law" within the meaning of 5 U.S.C. Sec. 701(a)(2) and that the substance of that decision is therefore unreviewable. We agree.
 
 
 9
 Judicial review of administrative actions is precluded only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). In such instances
 
 
 10
 [i]f ... no law fetters the exercise of administrative discretion, the courts have no standard against which to measure the lawfulness of agency action. In such cases no issues susceptible of judicial resolution are presented and the courts are accordingly without jurisdiction.
 
 
 11
 City of Santa Clara, Cal. v. Andrus, 572 F.2d 660, 666 (9th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978).
 
 
 12
 In a given context, precise meaning of the Overton Park test may be unclear to some. See generally B.J. Mezines, J. Stein & J. Gruff, 5 Administrative Law Sec. 44.03 (1983); K.C. Davis, Administrative Law Treatise, 1982 Supplement Sec. 28.16 (1982). Davis urges that the test " 'turns on pragmatic considerations as to whether an agency determination is the proper subject of judicial review.' " Id., quoting Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1043 (D.C.Cir.1979). Among those pragmatic considerations are the nature of the administrative expertise involved, whether "there are discernible guidelines against which the agency decision may be measured," Local 2855, AFGE (AFL-CIO) v. United States, 602 F.2d 574, 579 (3d Cir.1979), and whether the decision is the product of "political, military, economic, or managerial choices that are not really susceptible to judicial review." Id.
 
 
 13
 But whatever may be considered the appropriate expression of the Overton Park test, we are convinced that the decision of the Corps of Engineers in this case is one committed to agency discretion by law within the meaning of Sec. 701(a)(2) and is therefore unreviewable.
 
 
 14
 Section 204 of the Flood Control Act of 1965 is an example of a broad delegation of authority to the Corps of Engineers. The Act provides in pertinent part that
 
 
 15
 The project for flood control and improvement of the lower Mississippi River, adopted by the Act of May 15, 1928 (45 Stat. 534), as amended and modified, is hereby further modified and expanded to include the projects and plans substantially as recommended by the Chief of Engineers in House Documents Numbered 308 and 319, Eighty-eighth Congress, at an estimated cost of $181,109.00. * * *.
 
 
 16
 The Chief of Engineers made the following recommendation, set forth in House Document 308, 88th Congress:
 
 
 17
 70. After careful consideration of the report of the Mississippi River Commission, further studies made by the Commission subsequent to completion of its report, and the view of State and Federal agencies, I recommend modification of the Mississippi River and Tributaries project to provide for authorization of additional improvements in the alluvial valley of the Mississippi River between Cape Girardeau, Missouri, and the Head of Passes, Louisiana, as listed below and in the summary table in paragraph 69 of this report * * *
 
 
 18
 b. Levee improvements in the main-stem levee system and modification of the Birds Point-New Madrid Floodway at an estimated cost of $1,723,000, with the local cooperation requirements set forth in paragraph 18 of this report. * * *.
 
 
 19
 Paragraph 18 of the report stated in pertinent part that:
 
 
 20
 The local cooperation recommended for the Birds Point--New Madrid Floodway requires that local interests (a) provide without cost to the United States modified flowage easements to permit operation of the floodway at stages of 58 feet on the Cairo gage by artificial breaching of the levee, which right shall not be limited to the existing fuse plug sections[.]
 
 
 21
 The recommendation of the Chief Engineer was based upon the Report of the Mississippi River commission, which stated the following with respect to the Floodway:
 
 
 22
 63.b. Birds Point--New Madrid Floodway. The recommended modification of the Birds Point--New Madrid Floodway, to provide a higher degree of protection than now exists, presents a special situation. The floodway lands are subject to easement, purchased by the United States, to permit flooding by natural overtopping of a fuse plug section near the upper end of the floodway at a stage of 55 feet on the Cairo gage. The proposed improvement would assure protection of the lands from floods up to a stage of 60 feet on the Cairo gage, but would permit breaching of the levees at a stage of 58 feet if a flood higher than 60 feet were forecast. * * * It is deemed necessary to secure modified easements in the Birds Point--New Madrid area that will specifically permit breaching of the levee at any point. Local interests have indicated that they are willing to modify the easements to meet these requirements of operation. * * * Accordingly, the plan proposed in this report includes the provision that local interests will (a) provide * * * for all rights-of-way required for construction, (b) provide, without cost to the United States, modified flowage easements to permit operation of the floodway at stages of 58 feet on the Cairo gage by artificial breaching of the levees, which right shall not be limited to the existing fuse plug sections, (c) save and hold harmless the United States from any and all damages due to construction and operation of the modified plan, and (d) maintain the levees after completion, including the fuse plug sections, in accordance with Section 3 of the Act of 15 May 1928. (Emphasis supplied.)
 
 
 23
 House Document No. 308, 88th Congress, 2d Session, Report at 148-149.
 
 
 24
 It is clear from these excerpts that Congress authorized the raising of the levees and the artificial breaching of the levees at any point when the water reached 58 feet on the Cairo gauge with a prediction that the water might exceed 60 feet.[2] The Corps' 1983 plan clearly falls within the congressional authorization. However, Congress provided no additional standards for determining whether and where to crevasse the levee; it simply authorized the crevassing at any point on the frontline levee. Congressional delegation in this instance is therefore very broad in scope; furthermore, the delegation requires the Corps to exercise considerable expertise in a highly technical area. In such circumstances, the courts have little, if any, standards against which to assess the agency decision, thus rendering the substance of the agency action largely unreviewable. Cf. City of Santa Clara, Cal. v. Andrus, supra, 572 F.2d at 666-68.
 
 
 25
 In any event, reviewability assumed, we cannot find that the Corps' plan to artificially crevasse the frontline levee outside the upper fuse plug section is arbitrary and capricious or an abuse of discretion. A review of the record reflects that the Corps conducted extensive tests and engaged in extensive analysis regarding the potential flooding problems should the Floodway not be implemented pursuant to the 1983 plan. Agency determinations involving very technical areas of expertise are accorded a high degree of deference. See Baltimore Gas and Electric Co. v. Natural Resources Defense Council, Inc., --- U.S. ----, ----, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437, 450 (1983). That deference, of course, does not relieve the courts of the obligation to carefully examine the agency proceedings. Ethyl Corp. v. Environmental Protection Agency, 541 F.2d 1, 34-36 (D.C.Cir.), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). While one may question whether the Corps has chosen the wisest course, we conclude that the Corps' testing and analysis supply sufficient support for its adoption of the 1983 plan.
 
 
 26
 The district court's grant of a permanent injunction on the ground that the Corps of Engineers has abused its discretion must therefore be reversed.
 
 
 27
 This is not to say, however, that the procedures followed by the Corps of Engineers, or other collateral matters, are likewise unreviewable. As the court stated in Local 2855, AFGE (AFL-CIO) v. United States, supra, 602 F.2d at 580:
 
 
 28
 Even when a court ascertains that a matter has been committed to agency discretion by law, it may entertain charges that the agency lacked jurisdiction, that the agency's decision was occasioned by impermissible influences, such as fraud or bribery, or that the decision violates a constitutional, statutory or regulatory command. For the APA circumscribes judicial review only "to the extent that ... agency action is committed to agency discretion by law;" it does not foreclose judicial inquiry altogether. (Emphasis in the original; footnotes omitted.)
 
 
 29
 The district court found other grounds upon which to grant injunctive relief to appellees. These include findings that
 
 
 30
 (a) the Corps failed to comply with the National Environmental Policy Act (NEPA);
 
 
 31
 (b) the Corps' activities in obtaining the modified easements rises to the level of affirmative misconduct justifying estoppel against the government preventing it from implementing the 1983 plan;
 
 
 32
 (c) the Corps did not follow proper procedures in reaching its decision; and
 
 
 33
 (d) the Corps has not obtained all the necessary flowage easements required by the authorizing legislation.
 
 
 34
 We consider each of those grounds. Failure to comply with the National Environmental Policy Act.
 
 
 35
 The 1983 plan calls for artificial crevassing of the upper fuse plug at a location directly over or adjacent to the New Madrid fault. The district court concluded that the EIS failed to address the question whether operation of the Floodway could cause earthquake damage. The government argues that NEPA requires that the EIS discuss only reasonably expected environmental consequences of the proposed action, and contends that here earthquake damage is not such a reasonably expected consequence. It cites testimony of three expert witnesses adduced at trial to support its contention.
 
 
 36
 Appellees argue that the Corps' experts did not conclusively dispel the possibility that an earthquake might occur as a result of operation of the Floodway. They also note that the EIS does not refer to the possibility of earthquake; the Corps' evidence on this point was introduced only as a result of this judicial proceeding.
 
 
 37
 We agree with the government that the EIS need only address reasonably expected environmental consequences of the proposed action. See Environmental Defense Fund, Inc. v. Hoffman, 566 F.2d 1060, 1067 (8th Cir.1977); Monarch Chemical Works, Inc. v. Thone, 604 F.2d 1083, 1086 (8th Cir.1979); Metropolitan Edison Co. v. People Against Nuclear Energy, --- U.S. ----, 103 S.Ct. 1556, 1560-61, 75 L.Ed.2d 534 (1983). While experts can be wrong, on the record the government's expert witnesses dispelled the possibility that earthquake damage might be induced by the explosive charges needed to artificially crevasse the levee, or by flooding. Dr. Otto W. Nuttli, a professor of geophysics and expert in the field of earthquakes, testified that the only published account of earthquakes triggered by explosives occurred at the Nevada test site in the western United States. He testified that at the Nevada test site no earthquake had been triggered until an explosion equivalent to 10,000 tons of TNT occurred; here the proposed explosion necessary to artificially crevasse the levee involves no more than 200 tons of TNT, one-fiftieth the amount used in Nevada. Nuttli also testified that the layer of matter between the surface and the fault region was more capable of transmitting stresses in the Nevada region than in the Floodway region. He expressed his professional opinion that there was no possibility that operation of the Floodway would induce a measurable, damage-producing earthquake.[3] Dr. Nuttli's testimony was corroborated by the other experts, and similar testimony dispelled the possibility that inundation of the Floodway would result in a damage-producing earthquake. We conclude that the district court erred in granting the injunction in part because the EIS failed to address the possibility that operation of the Floodway would induce an earthquake.
 
 Estoppel
 
 38
 It is undisputed that the Corps adopted the 1966 plan to artificially crevasse only the upper fuse plug section of the levee at least in part in response to local objections to crevassing other parts of the levee. The President of the Mississippi River Committee, Ellsworth I. Davis, recommended that artificial crevassing be limited to the upper fuse plug section because local interests had expressed opposition to providing the right to crevasse elsewhere and because the probability existed of additional relief due to overtopping and natural crevasses. The Chief of Engineers accepted Davis' proposal. The government obtained flowage easements after formal adoption of the 1966 plan. Landowners testified at the trial below that they executed the easements in reliance upon the government's plan to crevasse only the upper fuse plug. The district court concluded that the government's activity in obtaining the flowage easements on the basis of the 1966 plan and then later adopting a revised plan substantially altering the operation of the Floodway and the impact of that operation on property within the Floodway rises to the level of affirmative misconduct warranting application of the doctrine of estoppel against the government.
 
 
 39
 We disagree. To establish an estoppel claim against the government, the claimant must prove, inter alia, the traditional elements of estoppel: false representation by the government with intent to induce the claimant to act on that representation, the claimant's lack of knowledge or inability to obtain the true facts, and reliance on the misrepresentation by the claimant to his injury. International Organization of Masters, Mates & Pilots v. Brown, 698 F.2d 536, 551 (D.C.Cir.1983), and cases therein cited. The record fails to disclose any false representation here. Several of the landowners testified that the agent of the Corps of Engineers responsible for negotiating the easements induced them to grant flowage easements by representing the Corps' intention to crevasse only the upper fuse plug. However, the landowners made no showing that the agent's statement was a misrepresentation; the record indicates that the statement was fully consistent with the plan adopted by the Corps in 1966 calling for such limited crevassing.
 
 
 40
 The only other feasible estoppel argument is that the agent's representation could reasonably be construed by the landowners as a promise that the Corps would never engage in artificial crevassing outside the upper fuse plug section. Assuming that the agent had the authority to bind the government to such a promise,[4] we find that the landowners could not reasonably construe the agent's representation as such a promise, nor could they rely on such a promise. In the first place, there is no testimony that the agent made a promise of this nature, only testimony that he represented to the landowners the Corps' intention to carry out the 1966 plan. There is likewise no evidence that, when the agent made that representation, the Corps intended anything other than to carry out the 1966 plan.[5] In addition, the terms of the flowage easements executed by the landowners clearly and unequivocally convey the right to the government to crevasse "any part or parts of the fuse plug sections." Similarly, the applicable legislation, the 1965 Flood Control Act, incorporates the specific recommendation of the Chief Engineer that "local interests ... permit ... artificial breaching of the levees, which right shall not be limited to the existing fuse plug sections." (Emphasis supplied.) House Document 308, 88th Congress, 2d Session. Finally, the Report of the Mississippi River Commission, made in conjunction with the 1965 flood control legislation, stated that "[i]t is deemed necessary to secure modified easements in the Birds Point--New Madrid area that will specifically permit breaching of the levee at any point." (Emphasis supplied.) House Document 308, 88th Congress, 2d Session, Report at 148-49.
 
 
 41
 In view of these very specific provisions in the flowage easements executed by the landowners and the reports and recommendation incorporated in the Flood Control Act of 1965, we see no merit in the landowners' estoppel claim. It might have been better practice for the Corps' agent to have explained fully to the landowners the extent of the interests they were conveying; however, the language of the easements was clear, unambiguous, and comprehensible to the landowners.[6]Failure to follow proper procedural requirements
 
 
 42
 The district court determined that the 1983 plan is a substantive rule, and that the Corps' failure to provide notice and an opportunity to comment before its promulgation violated the provisions of 5 U.S.C. Sec. 553. It concluded that the plan therefore was invalid, citing United States v. Gavrilovic, 551 F.2d 1099 (8th Cir.1977), and Hartnett v. Cleland, 434 F.Supp. 18 (D.S.C.1977).
 
 
 43
 The government contends that the Corps' plan is not a rule within the meaning of 5 U.S.C. Sec. 551(4), but that even if this court finds it to be a rule, approval of the plan is exempt from notice and comment rulemaking under 5 U.S.C. Sec. 553(a)(2) and Sec. 553(b)(A).
 
 
 44
 We agree with the government that the Corps' action here in altering the 1966 plan does not constitute a rule requiring notice of hearing. If a rule may be characterized as procedural, it is exempt from the notice and hearing requirements under 5 U.S.C. Sec. 553(b)(A). While characterization of a rule as substantive or procedural is a matter, to borrow a phrase, "enshrouded in considerable smog," Noel v. Chapman, 508 F.2d 1023, 1030 (2d Cir.), cert. denied, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975), we have followed the generally accepted principle that a substantive rule is one that affects individual rights and obligations. See, e.g., Emerson Electric Co. v. Schlesinger, 609 F.2d 898, 904 (8th Cir.1979).
 
 
 45
 Individual rights and obligations are not so affected in this case. Congress delegated broad discretion to the Corps to take the necessary measures to operate the Floodway effectively. The 1983 plan represents the Corps' intention to exercise that discretion; however, the plan does not limit the Corps' right and duty to undertake other measures on an ad hoc basis in the event of a flood emergency.
 
 
 46
 In addition, operation of the Floodway involves public property; at issue here is action to be taken pursuant to flowage easements owned by the government. Therefore the plan is exempt from the notice and hearing requirement under Sec. 553(a)(2). See, e.g., Eiseman v. Kleppe, 608 F.2d 1250, 1253 (9th Cir.1979), cert. denied, 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980); Oahe Conservancy Sub-District v. Alexander, 493 F.Supp. 1294, 1302-03 (D.S.D.1980).
 
 
 47
 Failure to obtain necessary flowage easements
 
 
 48
 Finally, the district court concluded that large portions of the Floodway are unencumbered by the modified flowage easements required by the Flood Control Act of 1965, and that therefore the Corps could not proceed with the plan to artificially crevasse the levees.
 
 
 49
 The government alleges that it has obtained all flowage easements necessary to legally operate the Floodway. It contends that its assessment of the adequacy of its property interests is solely a matter of discretion and not subject to judicial review, citing Berman v. Parker, 348 U.S. 26, 35-36, 75 S.Ct. 98, 103-104, 99 L.Ed. 27 (1954), and United States v. Mischke, 285 F.2d 628, 632 (8th Cir.1961).
 
 
 50
 We question whether the government has obtained all necessary easements. The modified flowage easements executed by the landowners convey to the government only the right to flood lands by artificial crevassing of the fuse plug sections of the frontline levee. However, the 1983 plan also calls for the artificial crevassing of the section of the frontline levee between the two fuse plug sections.
 
 
 51
 However, even if the government has failed to obtain the necessary easements, injunctive relief barring operation of the Floodway is not the appropriate remedy for such a failure. The landowners have an adequate remedy at law under the Tucker Act, 28 U.S.C. Secs. 1346(a)(2) and 1491. Hurley v. Kincaid, 285 U.S. 95, 104, 52 S.Ct. 267, 269, 76 L.Ed. 637 (1932); Buffalo River Conservation and Recreation Council v. National Park Service, 558 F.2d 1342, 1344 (8th Cir.1977), cert. denied, 435 U.S. 924, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978).
 
 
 52
 In summary, we hold that the district court erred in enjoining the Secretary of the Army and his subordinates in the United States Army Corps of Engineers from artificially crevassing the frontline levee of the Birds Point--New Madrid Floodway.
 
 Condemnation Cases
 
 53
 The government filed five complaints for the taking of property under power of eminent domain. It also filed declarations of taking under the Declaration of Taking Act, 40 U.S.C. Sec. 258a et seq., and made motions for immediate possession of the tracts of property it sought to have condemned. The district court denied the government's motions for immediate possession and dismissed the government's condemnation claims; its denial was based solely on its injunction prohibiting operation of the Floodway. Because we reverse the district court's issuance of the injunction, we likewise reverse its denial of the government's motion for immediate possession and its dismissal of the condemnation claims.
 
 
 54
 The district court also held that in the event its order denying condemnation and immediate possession is reversed, the government as a condition of obtaining possession of the property rights sought to be condemned must deposit the sum of $6,400,000.00 for Levee District No. 3 and $4,000,000.00 for St. John's Levee and Drainage District as just compensation. Those sums represent the amount the district court determined would be necessary to restore the levees after operation of the Floodway pursuant to the 1983 plan.
 
 
 55
 The district court clearly erred in requiring these massive deposits. The United States need only compensate the levee districts for the interest taken. Here the interest taken is an easement reserving to the United States the right inter alia to enter upon the levee at any time to place the Floodway in operation. The easement specifically requires the United States to repair the crevasses after operation of the Floodway upon the request of the levee districts. To require the government to deposit an amount estimated as necessary to repair damage to the levee which has not as yet occurred, and may never occur, and which the government is obliged by the terms of the condemnation complaint to repair is clear error.
 
 
 56
 The district court's order requiring the United States to deposit $10,400,000.00 is therefore reversed. We reverse and remand for proceedings consistent with this opinion.
 
 
 57
 Let mandate issue forthwith.
 
 
 
 [1]
 The government's earlier attempt to gain these interests by voluntary agreement had been unsuccessful
 
 
 [2]
 The only pertinent modification by Congress to the recommendation of the Chief of Engineers was the provision in Sec. 204 of the Act that any "modified easements required in the improvement of the ... Floodway shall be acquired as provided by section 4 of the Act of May 15, 1928. This modification, requiring the government to acquire the necessary easements, rather than requiring the landowners to provide the easements without cost to the government, does not alter the Corps' authority under the Act to breach the frontline levee at any point
 
 
 [3]
 The expert testified that even the dropping of a brick can produce a measurable movement in the earth, but that such movement must be distinguished from an earthquake of sufficient magnitude to be felt and to produce damage
 
 
 [4]
 The government strongly disputes that the agent had authority to bind the government. In view of our disposition of the estoppel issue, we need not address this issue
 
 
 [5]
 As we noted earlier, the Corps made its decision to change the 1966 plan only after acquiring additional information on actual river conditions acquired as a result of floods occurring in 1973, 1975 and 1979. Therefore no negative inference can be drawn from the mere fact of the Corps' change of position
 
 
 [6]
 It is also significant that the 1966 plan was enacted with the expectation that natural crevassing would occur; the hydraulic phenomenon the landowners are now trying to prevent was reasonably foreseeable, to some degree at least, at the time the easements were executed