# Authority of the Secretary of the Treasury to Order the Closing of Certain Streets Located Along the Perimeter of the White House

18 U.S.C. § 3056 grants the Secretary of the Treasury broad authority to take actions that are necessary and proper to protect the President, including the authority to order the closing of certain streets located along the perimeter of the White House.

May 12, 1995

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

This is in response to your request for a legal opinion from the Office of Legal Counsel ("OLC") on whether the Secretary of the Treasury ("Secretary") has the authority to order the closing to vehicular traffic of (1) Pennsylvania Avenue between 17th Street and Madison Avenue, (2) State Place, and (3) the segment of South Executive Avenue that connects into State Place in furtherance of his responsibility to protect the President under 18 U.S.C. § 3056. Based on a review of § 3056 and related statutes, their legislative histories, and relevant court and OLC opinions, we conclude that § 3056 grants the Secretary broad authority to take actions that are necessary and proper to protect the President. In light of the recommendations of the White House Security Review and the United States Secret Service's unique expertise and special responsibility in this matter, we agree with your conclusion that § 3056 authorizes the actions contemplated by the Secretary.

## I. Background

The White House Security Review, which was recently established by former Treasury Secretary Bentsen to examine White House security issues, has determined that "there is no alternative to prohibiting vehicular traffic on Pennsylvania Avenue that would ensure the safety of the President and others in the White House complex from explosive devices carried by vehicles near its boundaries." Request for Legal Opinion from Edward S. Knight, General Counsel, U.S. Department of Treasury, to Walter E. Dellinger, III, Assistant Attorney General, Office of Legal Counsel, U.S. Department of Justice 1 (May 10, 1995). You have informed this Office that in light of the Secretary's responsibilities to protect the President under § 3056, he is considering ordering the closing to vehicular traffic of portions of three streets that bound the grounds of the White House: (1) Pennsylvania Avenue between 17th Street and Madison Avenue, (2) State Place, and (3) the segment of South Executive Avenue that connects into State Place. *Id.* You have also informed this Office of your view that the conclusion of the

109

White House Security Review provides sufficient factual support for the Secretary to exercise his authority to close the streets mentioned above. *Id.*

We have been informally advised that in the past, the Secret Service has taken, on a temporary basis, actions similar to those contemplated. These actions have included closing streets and portions of highways to protect the President while traveling, closing parking garages to safeguard him against bomb threats, restricting airspace over the President, and cordoning off areas in hotels in which the President was present.[1] The Secret Service has also, on occasion, temporarily closed certain streets around the perimeter of the White House, including Pennsylvania Avenue.[2]

## II. *Legal Analysis*

### A. *Statutory Authority*

1. Section 3056
   Section 3056 provides, in pertinent part, that:

> [u]nder the direction of the Secretary of the Treasury, the United States Secret Service is authorized to protect . . .
> (1) The President, the Vice President (or other officer next in the order of succession to the Office of President), the President-elect, and the Vice President-elect [and]
> (2) The immediate families of those individuals listed in paragraph (1).

18 U.S.C. § 3056(a)(1)–(2).

In addition to that broadly-stated authority, officers and agents of the Secret Service are authorized, under the direction of the Secretary, to perform certain enumerated functions,[3] and to "perform such other functions and duties as are

---

[1] We have been advised by the Department of the Treasury that the Secret Service has historically taken these steps pursuant to its authority under 18 U.S.C. §§ 3056 and 1752, and 3 U.S.C. § 202. We have also been informed that the Secret Service generally takes such actions with the assistance of state and local law enforcement officials.

[2] The Department of the Treasury has informed us that East Executive Drive was permanently closed to vehicular traffic by the National Park Service in 1985. According to the Department of the Treasury, when the Park Service closed East Executive Drive, it consulted with the District of Columbia's Department of Transportation but did not file an application for street closing under the District of Columbia's street closing procedures.

[3] Such functions include the ability to:
  (A) execute warrants issued under the laws of the United States;
  (B) carry firearms;
  (C) make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony;
  (D) offer and pay rewards for services and information leading to the apprehension of persons involved in the violation or potential violation of those provisions of law which the Secret Service is authorized to enforce;

authorized by law." 18 U.S.C. § 3056(c)(1)(F). Aside from expressly granting certain powers generally afforded federal law enforcement personnel, the statute does not attempt to enumerate the specific actions the Secret Service may take in fulfilling its responsibility to protect the President.

The legislative history of § 3056 also does not include any enumeration of the specific actions the Secretary may take to protect the President. Although the Secret Service has routinely protected the President since the assassination of President McKinley in 1901, *see* S. Rep. No. 82–467, at 2–3 (1951), Congress did not provide explicit formal authority for this role until 1951. *See* Pub. L. No. 82–79, 65 Stat. 121, 122 (1951). Neither the congressional report language nor the floor debates concerning the authorizing legislation elaborate upon the activities and functions Secret Service officials may undertake in protecting the President. Moreover, subsequent amendments to § 3056 pertaining to the Secret Service's protection duties merely expanded the group of officials over which the Secret Service has protective responsibilities, without delineating how the protection is to be accomplished.

Although both the language of § 3056 and its legislative history are silent as to specific protective acts, the language and legislative history of 18 U.S.C. § 1752, which authorizes the Secretary to designate and regulate temporary residences of the President, provide some insight into the scope of the Secret Service's authority under § 3056 with respect to the environs of the White House. Section 1752 was apparently intended to provide the Secret Service with authority to provide the same degree of protection for the President outside the vicinity of the White House as Congress believed the Secret Service could exercise, under § 3056, within the vicinity of the White House. Section 1752 grants the Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President." 18 U.S.C. § 1752(d)(1). It also allows the Secretary "to prescribe regulations governing ingress or egress to such buildings and grounds and to posted, cordoned off, or otherwise restricted areas where the President . . . is or will be temporarily visiting." *Id.* § 1752(d)(2).

The legislative history of the statute suggests that, when enacting § 1752, Congress believed the Secret Service already had similar or greater authority to control access to the environs of the White House. In 1969, Senator Hruska introduced S. 2896, stating that its purpose was "to provide more effective control over unauthorized entry into the temporary residence of the President, and any buildings which are being temporarily used as executive office buildings." 115 Cong. Rec. 25,436 (1969) (statement of Sen. Hruska). The Senate Judiciary Committee report accompanying S. 2896 stated that the bill would "*extend* Federal protection to temporary residences and offices of the President." S. Rep. No. 91–1252, at 6

---

(E) pay expenses for unforeseen emergencies of a confidential nature under the direction of the Secretary of the Treasury and accounted for solely on the Secretary's certificate.

18 U.S.C. § 3056(c)(1).

(1970) (emphasis added). The report also mentioned that the bill was "designed to provide a uniform minimum of Federal jurisdiction for Presidential security when the President is on temporary visits," *id.*, noting the testimony of the Director of the Secret Service that "[f]rom a security standpoint, the President is most vulnerable when he is outside the White House complex traveling or residing temporarily in some other section of the country" and "the enactment of . . . [the] legislation is necessary in order to guarantee the safety of the President when he is temporarily absent from the Executive residence." *Id.* at 7. Finally, reflecting the belief that federal law already was adequate to ensure protection of the President within the vicinity of the White House, the report opined that "[a]lthough the Secret Service is charged with protecting the person of the President . . . there is, at the present time, no Federal statute which specifically authorizes them to restrict entry to areas where the President maintains temporary residences or offices." *Id.*

Similar themes were expressed during floor debate on the bill. In describing the problems confronting the Secret Service when protecting the President outside of Washington, Senator McClellan stated:

> Protecting the President . . . is a formidable task for the Secret Service, which is charged with safeguarding the personal life of the President. As difficult as this task is, however, it is rendered even more difficult because the Secret Service's present powers are somewhat limited. Title 18, section 3056 of the United States Code authorizes the Secret Service to protect the life of the President, but does little more. Consequently, the Service must rely upon a patchwork of State laws and local ordinances and local officers to clear areas for security perimeters, to provide for free ingress and egress when the President is visiting, and to protect the President's private homes from trespassers.

116 Cong. Rec. 35,651 (1970) (statement of Sen. McClellan). Moreover, Senator Hruska, speaking in support of the legislation, declared:

> [Under S. 2896, the] Secretary of the Treasury would be authorized to designate by regulations buildings and grounds which are temporary residences of the President and temporary offices of the President and his staff. The Secretary also would be authorized to prescribe regulations for admission to such buildings and grounds and to post or cordon off restricted areas where the President is or will be temporarily visiting . . . . It would be unconscionable not to recognize the obvious fact that the President's vulnerability is maximized when he is traveling or residing temporarily in

another section of the country. It would be unconscionable not to recognize the obvious fact that the Secret Service does not presently possess adequate Federal authority during these most vulnerable occasions. This body cannot ignore the obvious responsibility and duty it has at this moment to create the needed protection and authority.

116 Cong. Rec. 35,653 (1970) (statement of Sen. Hruska).[4]

It is clear that Congress did not perceive that it was giving the Secretary greater power to protect the President when he was away from the White House than when he was within it. Rather, the language and legislative history of § 1752 reflect a belief that the authority afforded by § 1752 with respect to temporary residences already was available with respect to the President's permanent residence, the White House.

Section 1752 plainly grants the Secretary authority to limit ingress and egress to an area where the President will be visiting to create a security perimeter, even when creating such a perimeter will require the closing of a public street to vehicular traffic. Since congressional action did not reflect any intent to give the Secretary greater authority under § 1752 than exists under § 3056, it would be incongruous for us to conclude that the Secretary has such authority with respect to temporary presidential residences but lacks the authority to limit ingress and egress to an area to create an appropriate security perimeter around the White House.

Turning back to the language of § 3056, we note again that Congress painted the Secret Service's Presidential protection authority with a broad brush. That treatment seems reasonable, given the nature of Presidential protection services. Protecting the President requires a certain amount of flexibility to respond quickly to changing and often potentially dangerous situations. Too tight a rein on the authority of the Secret Service would compromise Presidential security. As we have stated in affirming the authority of the Secret Service, under § 3056, to cordon off the area in the vicinity of the White House as a protective measure in anticipation of large-scale demonstrations, "the Secret Service may not have unlimited powers in protecting the President but its powers are broader than routine public safety measures. The test to be applied, it seems, is whether, given the overwhelming interest in protecting the President and his performance of his duties, the measures taken are reasonable under the circumstances." Memorandum for Honorable Robert E. Jordan, III, General Counsel, Department of the Army, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel at 11 (Nov. 12, 1969).

Relevant case law confirms this broad view. The Supreme Court has recognized that "[t]he Nation undoubtedly has a valid, even an overwhelming, interest in

---

[4] S. 2896 was passed by the Senate on Oct. 8, 1970, *see* 116 Cong. Rec. 35,654 (1970), and incorporated into the Omnibus Crime Control Act of 1970, Pub. L. No. 91–644, tit. V, § 18, 84 Stat. 1880, 1891 (1971).

protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence.'' *Watts v. United States*, 394 U.S. 705, 707 (1969). *See also White House Vigil for the ERA Committee v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984) (''At stake is not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world''). Accordingly, courts have construed the Secretary's authority under § 3056 broadly, even in the face of constitutional challenges. In fact, the only limitation the courts have recognized on the Secretary's authority has been the Constitution. Where, for example, first amendment rights have been implicated, courts have balanced the Secret Service's interest in protecting the President against the first amendment rights of those burdened by such actions.[5]

Even in the first amendment context, however, courts have been careful to allow the Secret Service latitude in acting to protect the President. In a decision concerning the Secret Service's denial of a White House press pass to a journalist, the D.C. Circuit required the Secret Service to publish the standards it uses to determine White House press pass eligibility. In delineating the requirements imposed on the Secret Service, however, it agreed with the Secret Service that the first amendment did not require ''detailed articulation of narrow and specific standards or precise identification of all the factors which may be taken into account in applying [the] standard.'' *Sherrill*, 569 F.2d at 130. The court stated that ''[i]t is enough that the Secret Service be guided solely by the principle of whether the applicant presents a potential source of . . . danger to the President and/or his immediate family so serious as to justify his exclusion.'' *Id.* (citation omitted). Arguing that this more flexible approach was appropriate given the mission of the Secret Service, the court declared that ''[t]his standard is sufficiently circumspect so as to allow the Secret Service, exercising expert judgment which frequently must be subjective in nature, considerable leeway in denying press passes for security reasons.'' *Id.* The court also indicated its belief that courts should be ''appropriately deferential to the Secret Service's determination of what justifies the inference that an individual constitutes a potential risk to the physical security of the President or his family.'' *Id.*

Courts have allowed the Secret Service even more latitude outside of the first amendment context. In *Scherer v. Brennan*, 379 F.2d 609 (7th Cir.), *cert. denied*, 389 U.S. 1021 (1967), the court found within the scope of the Secret Service's duties to protect the President the barring of a federally-licensed firearms dealer

---

[5] *See A Quaker Action Group v. Hickel*, 421 F.2d 1111, 1117–18 (D.C. Cir. 1969). *See also Sherrill v. Knight*, 569 F.2d 124, 128 n.14 (citing *A Quaker Action Group*, 421 F.2d at 1117 (''[t]he congressional grants of authority to the Secret Service to protect the President . . . and to control access to temporary presidential residences . . . cannot be said to authorize procedures or actions violative of the Constitution . . . . [W]e cannot agree with the Government's argument that mere mention of the President's safety must be allowed to trump any First Amendment issue'')).

from his own home and his constant surveillance even though he had voiced no direct threat to the President. The appellant argued that this invasion of privacy was illegal under the Supreme Court's analysis in *Camara v. San Francisco*, 387 U.S. 523 (1967) (holding that the fourth amendment requires a warrant for inspection of private premises by health inspectors unless the occupant consents thereto). In rejecting appellant's argument, the court stated, "Here, the need to protect the President of the United States from possible physical harm would justify measures that might not be considered appropriate in routine health inspections." *Scherer*, 379 F.2d at 612.

2. Section 202

In addition to the broad authority to protect the President granted in § 3056, 3 U.S.C. § 202 grants the "United States Secret Service Uniformed Division" authority to perform duties prescribed by the Secretary to protect the "White House in the District of Columbia" and "any building in which Presidential offices are located." This provision makes clear that the Secretary has authority to direct not only such action as is necessary to protect the person of the President but also the White House itself and the Old Executive Office Building, which is also bounded by the designated streets.

The language and legislative history of §§ 3056 and 1752, the authority granted in § 202, the court decisions, and former opinions of this Office suggest that while the Secretary's authority to protect the President may not be unlimited, the Secretary may take such actions as are consistent with the Constitution, not prohibited by statute, and reasonable under the circumstances for the protection of the President in the performance of his duties. We perceive no constitutional impediment to the closing of the designated streets. Consequently, given the conclusions of the White House Security Review with respect to the vulnerability of the White House, the Secretary would appear to have the authority to expand the security perimeter of the White House by closing the designated streets if the Secretary concludes that such action is reasonably necessary to protect the President. We now turn to consideration of whether any other statutes prohibit or limit such action.

B. *Other Relevant Statutes*

Other congressional grants of authority that could arguably apply to the streets at issue do not diminish the Secretary's authority to close them to vehicular traffic. We will discuss each such congressional grant of authority in turn.

1. District of Columbia Street Closing Authority

The District of Columbia government has exercised the power to close streets and transfer title within the District of Columbia since 1932, when Congress,

pursuant to its plenary powers over the District of Columbia,[6] granted it such authority. *See Techworld Dev. Corp. v. D.C. Preservation League,* 648 F. Supp. 106, 111 (D.D.C. 1986) (citing S. Rep. No. 72–688, at 3 (1932)). When Congress passed the District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93–198, 87 Stat. 774 (1973) (codified at D.C. Code Ann. §§ 1–211 to –299) ("Home Rule Act"), it delegated to the present District of Columbia government all powers that had been granted to the previous government, *see* D.C. Code Ann. § 1–227(a), including the power to close streets.

D.C. Code Ann. §§ 7–421 to –428 authorize the District of Columbia City Council ("D.C. Council") to close streets within the District of Columbia. The street closing process established by the D.C. Council requires referral of street closing applications to the National Capital Planning Commission for review and recommendation, to the Advisory Neighborhood Commissions affected, and to abutting property owners. *See* D.C. Code Ann. at § 7–422.

We do not believe D.C. Code Ann. §§ 7–421 to –428 or the Home Rule Act prevent the Secretary from closing the streets at issue. First, in passing the Home Rule Act, Congress provided that the D.C. Council shall have no authority to "[e]nact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District." *Id.* at § 1–233(a)(3). Rejecting the United States' assertion that the D.C. Council's act of closing a government-owned street in Northwest Washington violated this provision, the court in *Techworld* stated:

> [T]he limitation of § 1–233 is included to ensure that the local government does not encroach on matters of national concern. It withholds authority over property used by the United States in connection with federal governmental functions, and over property of national significance. The Council may not concern itself with the Lincoln Memorial, or the White House, or with the United States Courthouse. The closing of a small street in Northwest Washington, however, is precisely the sort of local matter Congress wishes the D.C. Council to manage.

*Techworld,* 648 F. Supp. at 115. *See also District of Columbia v. Greater Washington Cent. Labor Council, AFL–CIO,* 442 A.2d 110, 116 (D.C. 1982), *cert. denied,* 460 U.S. 1016 (1983) (quoting legislative history of the Home Rule Act: "The functions reserved to the federal level would be those related to federal operations in the District and to property held and used by the Federal Government for conduct of its administrative, judicial, and legislative operations; and for the monuments pertaining to the nation's past"). *See also id.* at 116 n.1 (quoting

---

[6] *See* U.S. Const. art. I, § 8, cl. 17.

*Hearings on Self-Determination for the District of Columbia*, pt. 2, 93d Cong. 52 (1973) (statement of John Nevius, former Chairman of the Council) ("For the purposes of identifying these Federal functions, we are speaking basically of three things: First, the function regarding Federal buildings and properties; second, the conduct of Federal business . . . and third, the function of international relations and matters concerning the diplomatic corps")).

Here, unlike the situation in *Techworld*, Congress has delegated by statute to the Secret Service the indisputably federal function of protecting the President. In this context, we believe that D.C. Code Ann. § 1–233(a)(3) establishes that the D.C. Council may not assert its authority where doing so would interfere with the Secret Service's ability to carry out its congressionally-mandated function of protecting the President.

Second, the streets slated for closing are located within the National Capital Service Area, a geographic area comprising many of our national governmental buildings and monuments, the White House, the National Mall and other areas, over which Congress in the Home Rule Act reserved some federal administrative authority. Section 739 of the Home Rule Act (codified at 40 U.S.C. § 136), established the National Capital Service Area. It also established the position of a presidentially-appointed National Capital Service Director within the Executive Office of the President and charged that office with assuring "that there is provided . . . adequate police protection and maintenance of streets and highways" within the National Capital Service Area. 40 U.S.C. § 136(b).

The National Capital Service Area provision was added to the Home Rule Act as a floor amendment. Suggesting that the National Capital Service Area was an area of heightened federal interest within the District of Columbia, the chief sponsor of the amendment, Representative Green, stated that the National Capital Service Director "would have jurisdiction [within the area] over the police department, fire protection, over sanitation, the streets, the roads and the accesses to them." 119 Cong. Rec. 33,611 (1973) (statement of Representative Green). *See also id.* at 33,645 ("the President would appoint a Director of Federal Area Services who would be responsible for police protection, fire protection, sanitation, the streets, and access roads"). While the language and legislative history of the provision do not suggest that the District of Columbia has no jurisdiction over the National Capital Service Area, they do suggest that Congress considered the federal government's interest in areas within the National Capital Service Area to be greater and more important than its interest in areas outside the National Capital Service Area. We believe this reservation of federal governmental interest further supports the Secret Service's authority to take unilateral action in closing

streets within the National Capital Service Area in an effort to protect the President.[7]

2. Administrative Procedure Act

You have also raised the issue of whether the Secretary's action would constitute a "rule" as defined by the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(4), *see generally id.* §§ 551–559, thereby triggering the requirement to provide "interested persons" with notice and opportunity to comment as a part of the rulemaking process. We believe that the Secretary could successfully argue that the notice and comment requirements of the APA do not apply because his action in closing the streets at issue to provide protection for the President is not a "rule" within the meaning of § 551(4). Moreover, if the federal government owns the streets in question, any action to close them would be exempt from the APA pursuant to the "public property" exception in § 553(a)(2).

The APA defines "rulemaking" as "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5). In defining a "rule", the APA identifies several components: a rule may be "of general or particular applicability"; it must be of "future effect"; and must be "designed to implement, interpret, or prescribe law or policy" or must "describe[ ] the organization, procedure, or practice requirements of an agency." *Id.* § 551(4).

We do not believe that closing the affected streets in order to protect the President is the sort of action that Congress intended to be subject to the APA's notice and comment process. A decision to close the streets would not be designed to "implement, interpret, or prescribe law or policy" so as to provide guidelines or procedures for parties to follow in the future. To the contrary, the Secretary's action in closing the streets would be an isolated agency action that does not affect or govern subsequent agency acts or decisions. *Daingerfield Island Protective Soc'y v. Babbitt*, 823 F. Supp. 950, 957 (D.D.C. 1993) (National Park Service approval of design for interchange connecting George Washington Memorial Parkway and island in Potomac River was not a "rule" under 5 U.S.C. § 551(4)). The Secretary would be acting in a particular situation based on a unique set of facts, pursuant to a statute authorizing his agency personnel, the Secret Service, to protect the President. We do not believe that this unilateral action executing such a decision is the sort of government action that Congress contemplated in defining a "rule" for purposes of the APA.[8]

---

[7] We are aware of only one District of Columbia court decision discussing the National Capital Service Area. The limited analysis presented in that opinion supports our view that the federal government exercises greater administrative authority over areas within the National Capital Service Area than it exercises with respect to other areas within the District of Columbia. In rejecting a claim that Congress had not delegated to the District of Columbia the authority to tax personal property within the National Capital Service Area, the court in *Itel Corp. v. District of Columbia*, 448 A.2d 261, 267 n.10 (D.C.), *cert. denied*, 459 U.S. 1087 (1982), stated, "this part of the Home Rule Act serves to add some federal bureaucracy to the existing D.C. bureaucracy in order to ensure adequate services, not to authorize the provision of services by the District."

[8] Even if a court were to find that the Secretary's action constituted a "rule" under § 551(4), the Secretary could invoke the "good cause" exception provided under 5 U.S.C. § 553(b)(3)(B). Under that section, the requirements

Moreover, even if the Secretary's contemplated action did constitute a "rule" under the APA, the APA provides an exception to its requirements for "[any] matter relating to agency management or personnel or to *public property*, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2) (emphasis added). The "public property" exception has been interpreted to exempt from APA coverage rules issued by any agency with respect to real or personal property owned by the United States or by any agency of the United States, including rules relating to the sale or management of such property. *Story v. Marsh*, 732 F.2d 1375, 1384 (8th Cir. 1984); *Wilderness Pub. Rights Fund v. Kleppe*, 608 F.2d 1250, 1253 (9th Cir. 1979), *cert. denied*, 446 U.S. 982 (1980); *City of Santa Clara v. Andrus*, 572 F.2d 660, 673–74 (9th Cir.), *cert. denied*, 439 U.S. 859 (1978). *See also* United States Dept. of Justice, Attorney General's Manual on the Administrative Procedure Act 27 (1947). Accordingly, if the streets sought to be closed to vehicular traffic are owned by the federal government, we believe that any action taken to close those streets would be exempt from the APA under § 553(a)(2).

## 3. National Historic Preservation Act

We do not believe that the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 to 470w–6, and the regulations promulgated pursuant to it, 36 C.F.R. §§ 800.1–.15 (1995), prohibit the Secretary from taking prompt action with respect to closing to vehicular traffic the contemplated streets. Section 106 of the NHPA provides that "prior to the approval of the expenditure of any Federal funds" on an "undertaking," the head of a federal agency must "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f. It further provides that the agency head shall afford the Advisory Council on Historic Preservation ("Advisory Council") a "reasonable opportunity" to comment on the effect that such undertaking will have on a historic site. *Id.* Although consultation with the Advisory Council must be had "prior to approval of [the] undertaking," 36 C.F.R. § 800.1(a), the agency head is not bound by the Advisory Council's comments or recommendations. *See id.* 36 C.F.R. § 800.6.

The vast majority of the areas that the Secretary contemplates closing, including Pennsylvania Avenue between 17th Street and Madison Avenue, and State Place, appear to be part of the "Lafayette Square Historic District," which is included in the National Register of Historic Places and is therefore one of the sites covered by section 106. National Register of Historic Places Inventory: Nomination Form for Lafayette Square Historic District.

---

of notice and opportunity for comment do not apply when the agency for good cause finds that the procedures are "impracticable, unnecessary, or contrary to the public interest." *Id.* We believe that in the instant case the Secretary's basis for invoking the good cause exception would be upheld, as there is a clear public interest in providing the President thorough and prompt protection when necessary to meet security requirements.

Whether the NHPA's consultation process for certain historic sites (section 106 process), 36 C.F.R. §§ 800.3–.5, is triggered depends on whether the agency's action is an "undertaking" under the NHPA. By regulation, the Advisory Council has defined the term "undertaking" as "any project, activity, or program that can result in changes in the *character or use* of historic properties, if any such historic properties are located in the area of potential effects." *Id.* § *800.2(o)* *(emphasis added).*[9] *Courts have tended to construe the definition broadly. Historic Green Springs, Inc. v. Bergland,* 497 F. Supp. 839, 853 (E.D. Va. 1980); *National Indian Youth Council v. Andrus,* 501 F. Supp. 649, 676 (D.N.M. 1980), *aff'd. sub nom. National Indian Youth Council v. Watt,* 664 F.2d 220 (10th Cir. 1981). And we cannot deny that the Secretary's contemplated action appears to fit within the definition in § 800.2(o) in that the street closing would make a direct change in the use of the historic area because it will prohibit a significant use currently allowed, that is, vehicular traffic.

Even if the contemplated street closing were considered an "undertaking" pursuant to 16 U.S.C. § 470f, however, it is our conclusion that the consultation requirements of the Advisory Council's regulatory scheme do not prohibit the Secretary from taking the necessary and immediate action to protect the President of closing to vehicular traffic the aforementioned streets. The statutory and regulatory framework of the NHPA cannot reasonably be read to require strict compliance with the consultation requirements in the case of an emergency. For example, if a water main breaks in an urban historic area, maintenance crews must be able to promptly remedy the situation even if that entails physical destruction of roads and sidewalks in the historic area and closure to all traffic for an extended period of time; surely Congress would not expect consultation before the maintenance work commenced. Similarly, if a crime is committed in an historic area or in an historic building, law enforcement officials would be able to secure the area if necessary to apprehend the perpetrators, preserve evidence, and take necessary and reasonable steps to ensure the safety of members of the public, even if such measures change the use of the historic site by re-routing traffic, setting up roadblocks, or denying access to buildings and areas. Again, those law enforcement actions could be handled promptly without compliance with the NHPA consultation requirements.

We do not construe the section 106 process to preclude the Secretary, after having "tak[en] into account the effect of the undertaking," from authorizing the undertaking to go forward initially on a provisional basis, with no irreversible effects, and thereafter giving the Advisory Council a reasonable opportunity to comment on it before deciding to put the undertaking on a final and permanent footing. In other words, as we construe the statute and regulation, the "under-

---

[9] In addition, "[t]he project, activity, or program must be under the direct or indirect jurisdiction of a Federal agency or licensed or assisted by a Federal agency. Undertakings include new and continuing projects, activities, or programs and any of their elements not previously considered under section 106." 36 C.F.R. § 800.2(o).

taking'' that requires prior consultation with the Advisory Council must be one that would effect a permanent change in the character and use of the site.

Common sense dictates that the NHPA could not require the Secretary to comply with the consultation and review procedures of the section 106 process in a manner which would compromise the Service's ability and mission to ensure the safety of the President and others in the White House complex. A contrary result would render the Service's broad authority under 18 U.S.C. § 3056 ineffective; it cannot be that Congress intended that the NHPA could mandate adherence to its procedural requirements when such adherence would directly interfere with the Secret Service's statutory duty to protect the President of the United States.

We believe that if the Secretary, as the exigencies permit, provides the Advisory Council with notice of the Service's protective actions and requests the Advisory Council's comments on the actions, the Secretary will be deemed to have complied with the NHPA's requirement that the agency head afford the Advisory Council a ''reasonable opportunity'' to comment. Of course, whether any given opportunity is reasonable depends on the particular circumstances at issue.

4. National Environmental Policy Act

You have also expressed concern about the possible impact of the National Environmental Policy Act of 1969, Pub. L. No. 91–190, 83 Stat. 852 (1970), as amended (codified at 42 U.S.C. §§ 4321–4370) (''NEPA''), and its related regulations concerning federal agency action, on the Secretary's ability to immediately close the identified streets. Without expressing a view as to whether or to what extent NEPA might apply to the street closings, we note that NEPA's emergency exception is broad enough to permit the Secretary to proceed after brief consultation with the Council on Environmental Quality. Section 1506.11 of title 40, Code of Federal Regulations, provides:

> Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the [NEPA regulations,] . . . the Federal agency taking the action should consult with the [Council on Environmental Quality] about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

We believe that the necessity revealed by the White House Security Review of enhancing the security perimeter around the White House is an ''emergency'' within the meaning of this regulation. Accordingly, we believe that the Secretary may close the designated streets without running afoul of NEPA. If possible, the Secretary should consult with the Council on Environmental Quality concerning alternative arrangements prior to closing the streets at issue.

## III. *Conclusion*

For the foregoing reasons, we conclude that the Secretary has authority under § 3056 to close the streets mentioned above to vehicular traffic. In addition, we conclude that the other congressional grants of authority discussed above do not diminish that authority.

RICHARD SHIFFRIN
TERESA WYNN ROSEBOROUGH
*Deputy Assistant Attorneys General*
*Office of Legal Counsel*